## UNITED STATES v. SHOSHONE TRIBE OF INDIANS.

No. 668. Argued March 31, April 1, 1938.—Decided April 25, 1938.

---

112

*Assistant. Attorney General McFarland,* with whom *Solicitor General Jackson* and *Mr. Oscar Provost* were on the brief, for the United States.

*Messrs. George M. Tunison* and *Albert W. Jefferis,* with whom *Mr. Charles J. Kappler* was on the brief, for respondent.

MR. JUSTICE BUTLER delivered the opinion of the Court.

The Shoshone Tribe brought this suit to recover the value of part of its reservation taken by the United States by putting upon it, without the tribe's consent, a band of Arapahoe Indians. The Court of Claims found the taking to have been in August, 1891, ascertained value as of that date, on that basis fixed the amount of compensation, and gave judgment accordingly. We held, 299 U. S. 476, that the court erred as to the date of the taking, declared it to have been March 19, 1878, reversed the judgment and remanded the case for further proceedings. Then the lower court proceeded to determine the value of the tribe's right at the time of the taking, and the amount to be added to produce the present worth of the money equivalent of the property, paid contemporaneously with the taking. It heard evidence, made additional findings, and gave plaintiff judgment for $4,408,-444.23, with interest from its date until paid. This Court granted writ of certiorari.

The sole question for decision is whether, as the United States contends, the Court of Claims erred in holding that the right of the tribe included the timber and mineral resources within the reservation.

The findings show: The United States, by the treaty of July 2, 1863, set apart for the Shoshone Tribe a reservation of 44,672,000 acres located in Colorado, Utah, Idaho and Wyoming. By the treaty of July 3, 1868, the tribe ceded that reservation to the United States. And by it the United States agreed that the "district of country" 3,054,182 acres definitely described "shall be and the same is set apart for the absolute and undisturbed use and occupation of the Shoshone Indians . . ., and the United States now solemnly agrees that no persons," with exceptions not important here, "shall ever be permitted to pass over, settle upon, or reside in" that territory. The Indians agreed that they would make the reservation their permanent home. The treaty provided that any individual member of the tribe having specified qualifications, might select a tract within the reservation which should then cease to be held in common, and be occupied and held in the exclusive possession of the person selecting it, and of his family, while he or they continued to cultivate it. It declared: ". . . Congress shall provide for protecting the rights of the Indian settlers . . . and may fix the character of the title held by each. The United States may pass such laws on the subject of alienation and descent of property as between Indians, and on all subjects connected with the government of the Indians on said reservation, and the internal police thereof, as may be thought proper."

The treaty emphasized the importance of education; the United States agreed to provide a schoolhouse and teacher for every thirty children, and the tribe promised to send the children to school. The United States also agreed to provide instruction by a farmer for members

cultivating the soil, clothing for members of the tribe, and a physician, carpenter, miller, engineer and blacksmith. It stipulated that no treaty for the cession of any portion of the reservation held in common should be valid as against the Indians, unless signed by at least a majority of all interested male adults; and that no cession by the tribe should be construed to deprive any member of his right to any tract of land selected by him.

When the treaty of 1868 was made, the tribe consisted of full blood blanket Indians, unable to read, write, or speak English. Upon consummation of the treaty, the tribe went, and has since remained, upon the reservation. It was known to contain valuable mineral deposits—gold, oil, coal and gypsum. It included more than 400,000 acres of timber, extensive well-grassed bench lands and fertile river valleys conveniently irrigable. It was well protected by mountain ranges and a divide, and was the choicest and best-watered portion of Wyoming.

In 1904 the Shoshones and Arapahoes ceded to the United States 1,480,000 acres to be held by it in trust for the sale of such timber lands, timber and other products, and for the making of leases for various purposes. The net proceeds were to be credited to the Indians. From 1907 to 1919 there were allotted to members of the tribes 245,058 acres.

The court's finding of the ultimate fact is: "The fair and reasonable value of a one-half undivided interest of the Shoshone or Wind River Reservation of a total of 2,343,540 acres, which was taken by the United States on March 19, 1878, from the Shoshone Tribe of Indians for the Northern Arapahoe Tribe, was, on March 19, 1878, $1,581,889.50." That is $1.35 per acre for 1,171,770 acres, one-half of the reservation in 1878, at the time of taking. The United States does not challenge the principle or

basis upon which the court determined the amount to be added to constitute just compensation.

The substance of the Government's point is that in fixing the value of the tribe's right, the lower court included as belonging to the tribe substantial elements of value, ascribable to mineral and timber resources, which in fact belonged to the United States.

It contends that the Shoshones' right to use and occupy the lands of the reservation did not include the ownership of the timber and minerals and that the *opinion* of the court below departs from the general principles of law regarding Indian land tenure and the uniform policy of the Government in dealing with Indian tribes. It asks for reversal with "directions to determine the value of the Indians' right of use and occupancy but to exclude therefrom 'the net value of the lands' and 'the net value of any timber or minerals.'"

The findings are unambiguous; there is no room for construction. The opinion of the Court of Claims may not be referred to for the purpose of eking out, controlling, or modifying the scope of the findings. *Stone* v. *United States,* 164 U. S. 380, 383. *Luckenbach S. S. Co.* v. *United States,* 272 U. S. 533, 539–540. Cf. *American Propeller Co.* v. *United States,* 300 U. S. 475, 479–480.

In this case we have held, 299 U. S. 476, 484, that the tribe had the right of occupancy with all its beneficial incidents; that, the right of occupancy being the primary one and as sacred as the fee, division by the United States of the Shoshones' right with the Arapahoes was an appropriation of the land *pro tanto;* that although the United States always had legal title to the land and power to control and manage the affairs of the Indians, it did not have power to give to others or to appropriate to its own use any part of the land without rendering, or assuming the obligation to pay, just compensation to the tribe,

for that would be, not the exercise of guardianship or management, but confiscation.

It was not then necessary to consider, but we are now called upon to decide, whether, by the treaty, the tribe acquired beneficial ownership of the minerals and timber on the reservation. The phrase "absolute and undisturbed use and occupation" is to be read, with other parts of the document, having regard to the purpose of the arrangement made, the relation between the parties, and the settled policy of the United States fairly to deal with Indian tribes. In treaties made with them the United States seeks no advantage for itself; friendly and dependent Indians are likely to accept without discriminating scrutiny the terms proposed. They are not to be interpreted narrowly, as sometimes may be writings expressed in words of art employed by conveyancers, but are to be construed in the sense in which naturally the Indians would understand them. *Worcester* v. *Georgia,* 6 Pet. 515, 582. *Jones* v. *Meehan,* 175 U. S. 1, 11. *Starr* v. *Long Jim,* 227 U. S. 613, 622–623.

The principal purpose of the treaty was that the Shoshones should have, and permanently dwell in, the defined district of country. To that end the United States granted and assured to the tribe peaceable and unqualified possession of the land in perpetuity. Minerals and standing timber are constituent elements of the land itself. *United States* v. *Cook,* 19 Wall. 591. *British-American Oil Co.* v. *Board,* 299 U. S. 159, 164–165. For all practical purposes, the tribe owned the land. Grants of land subject to the Indian title by the United States, which had only the naked fee, would transfer no beneficial interest. *Leavenworth, L. & G. R. Co.* v. *United States,* 92 U. S. 733, 742–743. *Beecher* v. *Wetherby,* 95 U. S. 517, 525. The right of perpetual and exclusive occupancy of the land is not less valuable than full title in fee. See

*Holden* v. *Joy*, 17 Wall. 211, 244. *Western Union Tel. Co.* v. *Pennsylvania R. Co.*, 195 U. S. 540, 557.

The treaty, though made with knowledge that there were mineral deposits and standing timber in the reservation, contains nothing to suggest that the United States intended to retain for itself any beneficial interest in them. The words of the grant, coupled with the Government's agreement to exclude strangers, negative the idea that the United States retained beneficial ownership. The grant of right to members of the tribe severally to select and hold tracts on which to establish homes for themselves and families, and the restraint upon cession of land held in common or individually, suggest beneficial ownership in the tribe. As transactions between a guardian and his wards are to be construed favorably to the latter, doubts, if there were any, as to ownership of lands, minerals or timber would be resolved in favor of the tribe. The cession in 1904 by the tribe to the United States in trust reflects a construction by the parties that supports the tribe's claim, for if it did not own, creation of a trust to sell or lease for its benefit would have been unnecessary and inconsistent with the rights of the parties.

Although the United States retained the fee, and the tribe's right of occupancy was incapable of alienation or of being held otherwise than in common, that right is as sacred and as securely safeguarded as is fee simple absolute title. *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 48. *Worcester* v. *Georgia, supra*, 580. Subject to the conditions imposed by the treaty, the Shoshone Tribe had the right that has always been understood to belong to Indians, undisturbed possessors of the soil from time immemorial. Provisions in aid of teaching children and of adult education in farming, and to secure for the tribe medical and mechanical service, to safeguard tribal and individual titles, when taken with other parts of the

treaty, plainly evidence purpose on the part of the United States to help to create an independent permanent farming community upon the reservation. Ownership of the land would further that purpose. In the absence of definite expression of intention so to do, the United States will not be held to have kept it from them. The authority of the United States to prescribe title by which individual Indians may hold tracts selected by them within the reservation, to pass laws regulating alienation and descent and for the government of the tribe and its people upon the reservation detracts nothing from the tribe's ownership, but was reserved for the more convenient discharge of the duties of the United States as guardian and sovereign.

*United States* v. *Cook, supra,* gives no support to the contention that in ascertaining just compensation for the Indian right taken, the value of mineral and timber resources in the reservation should be excluded. That case did not involve adjudication of the scope of Indian title to land, minerals or standing timber, but only the right of the United States to replevin logs cut and sold by a few unauthorized members of the tribe. We held that, as against the purchaser from the wrongdoers, the United States was entitled to possession. It was not there decided that the tribe's right of occupancy in perpetuity did not include ownership of the land or mineral deposits or standing timber upon the reservation, or that the tribe's right was the mere equivalent of, or like, the title of a life tenant.

The lower court did not err in holding that the right of the Shoshone Tribe included the timber and minerals within the reservation.

*Affirmed.*

Mr. Justice Stone and Mr. Justice Cardozo took no part in the consideration or decision of this case.

Mr. Justice Reed dissents.