*580 The opinion of the Supreme Court was delivered by
Mr. •Justice Byrnes,
as follows:
This is an action to recover compensation for some 5y2 million acres of land allegedly taken from the petitioner tribe in 1879 and 1884. The suit was initiated under the Act of June 8, 1920 (41 Stat. 738) permitting petitioner to submit to the Court of Claims any claims arising from the asserted failure of the United States to pay money or property due, without regard to lapse of time or statutes of limitation. The Court of Claims denied recovery (94 C. Cls. 150) and we brought the case here on certiorari (315 U. S. 790).
The facts as found by the Court of Claims are as: follows:
In 1868 the United States and the Sioux Tribe entered into the Fort Laramie Treaty (15 Stat. 635). By Article II of this treaty a certain described territory, known as the Great Sioux Reservation and located in what is now South Dakota and Nebraska, was “set apart for the absolute and undisputed use and occupation” of the Tribe. The United States promised that no persons, other than government officei’s and agents discharging-their official duties, would be permitted “to pass over, settle upon, or reside in the territory described in this article, or in such territory as may be added to this reservation for the use of said Indians.” For their part, the Indians relinquished “all claims or right in and to any portion of the United States or Territories, except such as is embraced within the limits aforesaid.” No question arises in this case with respect to the lands specifically included within the Reservation by this treaty.
The eastern boundary of the Great Sioux Reservation, as constituted by the Ft. Laramie Treaty, was the low water mark on the east bank of the Missouri River.[1]' The large tract bordering upon and extending eastward from the east bank of the river remained a part of the public domain open to settlement and afforded easy access to the Reservation. As a result great numbers-of white men “infested” the region for the purpose of' engaging in the liquor traffic. Anxiety over this development led the Commissioner of Indian Affairs on *581 January 8, 1875, to suggest to the Secretary of the Interior that he request the President to issue an Executive order withdrawing from sale and setting apart for Indian purposes a certain large tract of the land along' the eastern bank of the Missouri River. In the Commissioner’s letter to the Secretary of the Interior, and in the latter’s letter of January 9th to the President, the reason advanced for the proposed Executive order was that it was “deemed necessary for the suppression of the liquor traffic with the Indians upon the Missouri River.” On January 11, 1875, the President signed the suggested order. It described the territory affected and provided that it “be, and the same hereby is, withdrawn from sale and set apart for the use of tile several tribes of Sioux Indians as an addition to their present reservation.” On two occasions thereafter, once in February and again in May, white persons who had settled on the land in question prior to the issuance of the Executive order and who feared that its effect was to deprive them of their holdings, were informed by the Commissioner of Indian Affairs that the object of the Executive order was “to enable the suppression of the liquor traffic with the Indians on the Missouri River,” that it did not affect the existing rights of any persons in the area, that it was not “supposed that the withdrawal will be made permanent,” and that no interference with the peaceful occupancy of the territory had been intended.
On March 13, 1875, the Commissioner of Indian Affairs addressed another letter to the Secretary of the Interior. In it he recommended that the Secretary request the President to withdraw from sale and set apart for Indian purposes another tract of land bordering the Great Sioux Reservation, this time to the north and northeast. The reason given was similar to that for which the first order had been sought: “viz: the suppression of the liquor traffic with Indians at the Standing Rock Agency.” As a “further reason for said request” the Commissioner stated that “the Agency buildings, as now located at Standing Rock, are outside the reservation as defined by [the Fort Laramie] treaty . . . but are included in the tract proposed to be withdrawn.” The Secretary forwarded the Commissioner’s report to the President with his concurrence, repeating that the “enlargement of the Sioux reservation in Dakota” was “deemed necessary for the suppression of the liquor traffic with the Indians at the Standing Rock Agency.” On March 16, 1875, the President issued a second Executive-order describing the tract of land involved and declar *582 ing that it “be, and the same hereby is, withdrawn from sale and set apart for the use of the several tribes of the Sioux Indians as an addition to their present reservation in said Territory.”
In mid-May of 1875 the Secretary of War transmitted to the Secretary of the Interior a letter from the officer in command of the Southern District of the Military Department of Dakota in which it was pointed out that a small tract of land along the eastern bank of the Missouri Eiver opposite the southern corner of the Sioux Reservation was still open to settlement and afforded “a very nice point for whiskey sellers and horse thieves.” Upon the basis of this letter, the Commissioner recommended to the Secretary of the Interior and the Secretary recommended to the President the issuance of still a third Executive order withdrawing the described tract from settlement. On May 20, 1875, the Executive order was issued in the same form as its two predecessors.
Finally upon a similar complaint from the Acting Agent of the Standing Rock Agency that a small piece •of land to the north of the reservation was being used as a base of operations by persons selling liquor and ammunition to the Sioux Indians, the Commissioner of Indian Affairs and the Secretary of the Interior recommended a further order to “effectually cut off these whiskey dealers.” In his letter to the Secretary dated November 24, 1876, the Commissioner stated: “ít is not proposed to interfere with the vested rights, or the legitimate business of any settler who may be upon this tract.” The President issued a fourth Executive order in the usual form on November 28,1876. On December 13, 1876, the Commissioner notified the agent at Standing Rock that the order had been issued, and added that it was “not intended to interfere with the vested rights of any settler upon the tract or with the legitimate business pursuits of any person lawfully residing within its limits.”
About two and a half years after the last of these four Executive orders withdrawing lands from sale and setting them apart for the use of the Sioux, the Commissioner of Indian Affairs submitted to the Secretary of the Interior a report upon a suggestion that the orders be modified so as to permit the return of the lands to the public domain. The report, dated June 6, 1879, reviewed the problems arising from the liquor trade during the years following the Fort Laramie treaty, recalled that the purpose of the four Executive orders *583 of 1875 and 1876 bad been to eliminate this traffic, observed that they had “to a great extent accomplished the object desired, viz: the prevention of the sale of whiskey to the Indians,” and concluded that any change in the boundaries established by the Executive orders would “give renewed life to this unlawful traffic, and be detrimental to the best interests of the Indians.”
Three weeks later, however, upon reconsideration, the Commissioner informed the Secretary that in his opinion the lands included in the Executive orders of 1875 and 1876 might be “restored to the public domain, and the interests of the Indians still be protected.” In explanation he stated:
“These lands were set apart for the purpose, as alleged,, of preventing illegal liquor traffic with the Indians. At the time said lands were set apart there was no law providing a punishment for the sale of liquor to Indians, ‘except to Indians in the Indian country’, but, by the Act of February 27, 1877 (19 Stat. 244), persons who now engage in liquor traffic with Indians, no matter in what locality, are liable to a penalty of $300, and two years imprisonment, and, therefore, the necessity for so large a reservation for the protection of these Indians in this respect does not now exist.”[2]
Accordingly, he recommended that the lands withdrawn from sale by the President in 1875 and 1876 be returned to the public domain with the exception of three small tracts directly opposite the Cheyenne, Grand River, and Standing Rock agencies. On August 9,1879, an executive order to this effect was promulgated and the land with the exceptions indicated was “restored to the public domain.” Five years later the Commissioner informed the Secretary that the Grand River Agency had ceased to exist and that the agents at Cheyenne and Standing Rock considered it no longer necessary to withhold the tracts opposite their agencies from the public domain “for the purpose for which they have thus far been retained.” Consequently, an executive order was prepared and signed by the President on March 20, 1884, restoring these three small pieces of land to the public domain, “the same being no longer needed for the purpose for which they were withdrawn from sale and settlement.”
One additional event remains to be noted. In the Indian Appropriation Act for 1877, approved August 15, 1876 (19 Stat. 176, 192), Congress provided:
*584 “. . . hereafter there shall be no appropriation made for the subsistence of said Indians [i. e., the Sioux] unless they shall first agree to relinquish all right and claim to any country outside the boundaries of the permanent reservation established by the treaty of eighteen hundred and sixty-eight [the Fort Laramie treaty] for said Indians; and also so much of their said permanent reservation as lies west of the one hundred and third meridian of longitude [the western boundary set by the Fort Laramie treaty had been the 104th meridian], and shall also grant right of way over said reservation to the country thus ceded for wagon or other roads, from convenient and accessible points on the Missouri Elver ...”
On September 26, 1816 — a date subsequent to the first three of the four Executive orders setting apart additional lands for the use of the Sioux, but about two months prior to the last of those orders — the Sioux Tribe signed an agreement conforming to the conditions imposed by Congress in the Indian Appropriation Act and promised to “relinquish and cede to the United States all the territory lying outside the said reservation, as herein modified and described. ...”[3]
Petitioner’s position is that the Executive orders of 1875 and 1876 were effective to convey to the Tribe the same kind of interest in the lands affected as it had acquired in the lands covered by the Fort Laramie Treaty, that the Executive orders of 1879 and 1884 restoring the lands to the public domain deprived petitioner of this interest, and that it is entitled to be compensated for the fair value of the lands as of 1879 and 1884. The government defends on several grounds: -first, that in general the President lacked authority to confer upon any individual or group a compensable interest in any part of the public domjain; second, that even if he had the power to convey such a compensable interest, the President did not purport to do so in this case; and third, that in any event by the treaty of 1876 the Sioux relinquished whatever rights they may have had in the lands covered by the first three of the four executive orders.
Section 3 of Article IV of the Constitution confers upon Congress exclusively “the power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.” Nevertheless, “from an early period in the *585 history of the government it has been the practice of the President to order, from time to time, as the exigencies of the public service required, parcels of land belonging to the United States to be reserved from sale and set apart for public uses.” Grisar v. McDowell, 6 Wall. 363, 381. As long ago as 1830 Congress revealed its awareness of this practice and acquiesced in it.[4] By 1855 the President had begun to withdraw public lands from sale by executive order for the specific purpose of establishing Indian reservations.[5] From that date until 1919,[6] hundreds of reservations for Indian occupancy and for other purposes were created by executive order. Department of the Interior, Executive Orders Relating to Indian Reservations, passim; United States v. Midwest Oil Co., 236 U. S. 459, 469-470. Although the validity of these orders was occasionally questioned,[7] doubts were quieted in United States v. Midwest Oil Co., supra. In that case it was squarely held that even in the absence of express statutory authorization, it lay within the power of the President to withdraw lands from the public domain. Cf. Mason v. United States, 260 U. S. 545.
The government therefore does not deny that the executive orders of 1875 and 1876 involved here were effective to withdraw the lands in question from the public domain. It contends, however, that this is not the issue presented by this case. It urges that instead we are called upon to determine whether the President had the power to bestow upon the Sioux Tribe an interest in these lands of such a character as to require compensation when the interest was extinguished by the Executive orders of 1879 and 1884. Concededly, where lands have been reserved for the use and occupation of an Indian Tribe by the terms of a treaty or statute, the tribe must be compensated if the lands are subsequently taken from them. Shoshone Tribe v. United States, 299 U. S. 476; United States v. Shoshone Tribe, 304 U. S. 111; United States v. Klamath Indians, 304 U. S. 119. Since the *586 Constitution places the authority to dispose of public lands exclusively in Congress, the executive’s power to convey any interest in these lands must be traced to Congressional delegation of its authority. The basis of decision in United States v. Midwest Oil Co. was that, so far as the power to withdraw public lands from sale is concerned, such a delegation could be spelled out from long continued congressional acquiescence in the executive practice. The answer to whether a similar delegation occurred with respect to the power to convey a com-pensable interest in these lands to the Indians must be-found in the available evidence of what consequences were thought by the executive and Congress to flow from the establishment of executive order reservations.[8]
It is significant that the executive department consistently indicated its understanding that the rights and interests which the Indians enjoyed in executive order reservations were different from and less than their rights- and interests in treaty or statute reservations. The annual reports of the Commissioner of Indian Affairs during the years when reservations were frequently being established by executive order contain statements that *587 the Indians had “no assurance for their occupation of these lands beyond the pleasure of the Executive,”[9] that they “are mere tenants at will, and possess no permanent rights to the lands upon which they are temporarily permitted to remain,”[10] and that those occupying land in executive order reservations “do not hold it by the same tenure with which Indians in other parts of the Indian Territory possess their reserves.”[11]
Although there are abundant signs that Congress was aware of the practice of establishing Indian reservations by executive order, there is little to indicate what it understood to be the kind of interest that the Indians obtained in these lands. However, in its report in 1892 upon a bill to restore to the public domain a portion of the Colville executive order reservation, the Senate Committee on Indian Affairs expressed the opinion that under the executive order “the Indians were given a license to occupy the lands described in it so long as it was the pleasure of the Government that they should do so, and no right, title, or claim to such lands has vested in the Indians by virtue of this occupancy.”[12]
Petitioner argues that its position finds support in Section 1 of the General Allotment Act of February 8, 1887,[13] which provides:
“That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and, he hereby is, authorized ... to cause said reservation ... to be surveyed . . . and to allot the lands in said reservation in severalty to any Indian located thereon . . .”
By Section 5 provision was made for issuance of patents to the allottees by which the United States promised to hold the lands in trust for the allottees and their heirs for 25 years and thereafter to convey to them full title. Petitioner urges that by including executive order reservations within the provisions of this Act, Congress revealed *588 its belief that the degree of ownership enjoyed by Indian tribes is identical whether the reservation is created by treaty, statute, or executive order. But there is much to contradict this interpretation. For example, during the course of the debate on the measure Senator Dawes, a member of the Committee reporting the bill, frequently distinguished between the character of title enjoyed by the Indians on statute and treaty reservations and that enjoyed by those on executive order reservations, and no exception was taken to his remarks. 17 Cong. Rec. 1559, 1630,1631,1763. Moreover, in its 1892 report on the bill to abolish a portion of the Colville reservation, to which we have referred, the Senate Committee on Indian Affairs explained:
“An erroneous idea seems to have grown up, that the Indian allotment act [of 1887] and its amendments have given additional sanctions to executive reservations, and operated to confer titles upon the Indians occupying them they did not before possess. ... At the time of the enactment of this statute, there were fifty-six executive reservations, embracing perhaps from 75,000,000 to 100,-000,000 acres of the public lands, in which the Indians had no right or claim of title and which could be extinguished by act of the President. It would be preposterous to place such a construction upon the language of this act as would divest the United States of its title to these lands.”[14]
This statement by the Committee which reported the general Allotment Act of 1887, made within five years of its passage, is virtually conclusive as to the significance of that Act. We think that the inclusion of Executive order reservations meant no more than that Congress was willing that the lands within them should be allotted to individual Indians according to the procedure outlined. It did not amount to a recognition of tribal ownership of the lands prior to allotment. Since the lands involved in the case before us were never allotted — indeed, the Executive orders of 1879 and 1884 terminated the reservation even before the Allotment Act was passed, — we think the Act has no bearing upon the issue presented.
Perhaps the most striking proof of the belief shared by Congress and the Executive that the Indians were not entitled to compensation upon the abolition of an Executive order reservation is the very absence of com *589 pensatory payments in such situations. It was a common practice during the period in which reservations, were created by Executive order for the President simply to terminate the existence of a reservation by can-celling or revoking the order establishing it. That is to say, the procedure followed in the case before us was-typical. No compensation was made, and neither the government nor the Indians suggested that it was due.[15] It is true that on several of the many occasions when Congress itself abolished Executive order reservations,, it provided for a measure of compensation to the Indians. In the Act of July 1,1892, restoring to the public domain a large portion of the Colville reservation[16] and in the Act of February 20, 1893 restoring a portion of the-White Mountain Apache Indian Reservation,[17] Congress directed that the proceeds from the sale of the lands be used for the benefit of the Indians. But both acts contained an explicit proviso: “That nothing herein contained shall be construed as recognizing title or ownership of said Indians to any part of said . . . Reservation, whether that hereby restored to the public domain or that still reserved by the government for their use and occupancy.” Consequently, the granting of compensation must be regarded as an act of grace rather than a recognition of an obligation.
We conclude therefore that there was no express constitutional or statutory authorization for the conveyance of a compensable interest to petitioner by the four Executive orders of 1875 and 1876 and that no implied Congressional delegation of the power to do so can be spelled out from the evidence of Congressional and Executive-understanding. The orders were effective to withdraw from sale the lands affected and to grant the use of the-lands to the petitioner. But the interest which the Indians received was subject to termination at the will of either the Executive or Congress and without obligation to the United States. The Executive orders of 1879- and 1884 were simply an exercise of this power of termination and the payment of compensation was not required. Affirmed.
The Chief Justice took no part in the consideration or-decision of this case.

 The Great Sioux Reservation also included two small theretofore existing: reservations located on the east bank of the river. They are of no consequence-so far as the present dispute is concerned.

 Letter from Commissioner to Secretary of the Interior, dated June 27, 1879.

 This treaty was ratified by the Act of February 28, 1877 (19 Stat. 254)

 Tlie Pre-emption Act of May 29, 1830, excluded from its provisions “any land which is reserved from sale by Act of Congress, or by order of the President.” 4 Stat. 420. 421. “Lands included in any reservation by any treaty, law, or proclamation of the President” were excluded from the operation of the Pre-emption Act of September 4, 1841. 5 Stat. 453. 456.

 Cohen, Handbook of Federal Indian Law (1941) 299; Department of the Interior, Executive Orders Relating to Indian Reservations, Vol. I, p. 79.

 By § 27 of the Act of June 30, 1919, Congress declared that thereafter “no public lands of the United States shall be withdrawn by Executive Order, proclamation, or otherwise for or as an Indian reservation except by Act of Congress.” 41 Stat. 3, 34. In 1927 Congress added a provision that any future changes in the boundaries of executive order reservations should be made by Congress alone. § 4, 44 Stat. 3 347.

 See 14 Op. A. G. 381 (1873). But cf. 17 Op. A. G. 258 (1882).

 This question is an open one. It is true that language appearing in two-decisions of this Court suggests that the tribal title to a reservation is the same whether the reservation has been created by statute or treaty or by executive order. Re wilson, 140 U. S. 575, 577; Spalding v. Chandler, 160 U. S. 394, 403. Cf. C. N. Cotton, 12 L. D. 205 (1890); William P. Tucker et al., 13 L. D. 628 (1891). In re Wilson, however, it was conceded by all concerned that an executive order reservation was “Indian country” within the meaning of that term as it appeared in certain statutes defining the criminal jurisdiction of united States courts and territorial courts. No question was raised by the case with respect to the character of the tribe’s interest in the reservation. Moreover, the dictum referred to was based upon the assumption that the Allotment Act of 1887 (24 Stat. 388) amounted to a Congressional recognition of tribal title to executive order reservations. The invalidity ol' this assumption is demonstrated in a later portion of our opinion. The issue in Spalding v. Chandler concerned the effect of the Pre-emption Act of September 4, 1841 (5 Stat. 453) upon an Indian reservation created by treaty and preserved by executive order and did not involve a determination of whether the Indians enjoyed a compensable interest in an executive order reservation. And twenty-eight years thereafter when the Attorney General ruled, on the-authority of united States v. Midwest Oil Co., that executive order reservations were not a part of the public domain for purposes of the General Leasing Act of 1920 (41 Stat. 437), he took occasion to remark: “-Whether the President might legally abolish, in whole or in part, Indian reservations once created by him, has been seriously questioned (12 L. D. 205; 13 L. D. 628) and not without strong reasons; for the Indian rights attach when the lands are thus set aside; and moreover, the lands then at once become subject to allotment under the General Allotment Act. Nevertheless, the President has in fact, and in a number of instances, changed the boundaries of executive order Indian reservations by excluding lands therefrom, anil the questioti of Ms authority to do so has not apparently come before the courts." 34 Op. A. G. 171, 176 (emphasis-added) .

 Annual Report of Commissioner of Indian Affairs (1872), H. R. Exec. Doc., 42d Cong., 3d Sess., Vol. Ill, No. 1, part 5, p. 472.

 Id. (1878), H. R. Exec. Doc., 46th Cong., 3d Sess., Vol. IX, No. 1, part 5, p. 486; id. (1880), H. R. Exec. Doc., 46th Cong., 3d Sess., Vol. IX, No. 1, part 6, p. 96.

 Id. (1886), H. R. Exec. Doe., 49th Cong., 2d Sess., Vol. 8, No. 1, part 5, p. 88.

 S. Rep. No. 664, 52d Cong., 1st Sess., p. 2.

 24 Stat. 388.

 S. Rep. No. 664, 52d Cong., 1st Sess., p. 2.

 See, e. g., Department of the Interior, Executive Orders Relating to IndAan-Reservations, Vol. 1, pp. S, 6, 21, 30, 37, 43, 44, 48-50 ; Hearings before a Subcommittee of the Committee on Indian Affairs on S. 1722 and S. 3159,. 69th Cong., 1st Sess., pp. 104-105.

 27 Stat. 62, 63.

 27 Stat. 469, 470.