**KARUK TRIBE OF CALIFORNIA,**
Plaintiff,

and

Carol Ammon, et al., Plaintiffs,

and

Yurok Indian Tribe, Plaintiff,

v.

The UNITED STATES, Defendant,

and

Hoopa Valley Tribe, Defendant–
Intervenor.

Nos. 90–3993L, 91–1432L, 92–173L.

United States Court of Federal Claims.

Aug. 6, 1998.

Dennis J. Whittlesey, Washington, DC, for plaintiff Karuk.

George Forman, Berkeley, CA, for plaintiff Yurok, with whom was John Shordike, of counsel.

William C. Wunsch, San Francisco, CA, for plaintiffs Ammon et al.

Susan V. Cook, General Litigation Section, Environmental & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant, with whom were Lois J. Schiffer, Assistant Attorney General, James E. Brookshire, Deputy Chief, and Thomas L. Halkowski, Trial Attorney.

Thomas P. Schlosser, Seattle, WA, for defendant-intervenor, with whom was K. Allison McGaw.

## OPINION

MARGOLIS, Judge.

In this consolidated action, plaintiffs, the Karuk Tribe of California ("Karuk"), the Yurok Indian Tribe ("Yurok"), and individual Indians led by Carol McConnell Ammon ("Ammon Group"), move for summary judgment, claiming that the 1988 Hoopa–Yurok Settlement Act, 25 U.S.C. § 1300i *et seq.*, effected a Fifth Amendment taking of their property interests in the former Hoopa Valley Reservation ("Reservation"). All plaintiffs rely upon the Act of April 8, 1864, 13 Stat. 39, as the basis for their vested property claims. Plaintiffs further point to actions of defendant, the United States, such as allocation of funds for the tribes on the Reservation, allotment of land to individual Indians, and provision of education and other benefits to tribe members as support for their contention. Plaintiff Ammon Group also alleges that defendant is collaterally estopped by prior litigation from denying plaintiffs' vested interests in the Reservation. Defendant and defendant-intervenor, the Hoopa Valley Tribe, cross move for summary judgment, contending that neither the 1864 Act nor any subsequent benefits conferred thereunder vested any compensable property rights. As a result, defendant and defendant-intervenor argue, the 1988 Act does not implicate the Takings Clause of the Fifth Amendment. Defendant and defendant-intervenor also move for summary judgment on the basis that plaintiffs are collaterally estopped from claiming a taking due to a prior case involving the Reservation. After a full briefing and oral argument on the issue, this court grants defendant and defendant-intervenor's motion for summary judgment, based solely

on the takings grounds, and denies plaintiffs' summary judgment motions.

## FACTS

The Hoopa Valley Reservation was created pursuant to the Act of April 8, 1864, 13 Stat. 39 ("1864 Act"). The pertinent part of the 1864 Act states that

> [t]here shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said state, to be retained by the United States for purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state, and shall be located as remote from white settlements as may be found practicable, having due regard to their adaptation to the purposes for which they are intended....

13 Stat. at 40. In 1865, the Reservation's boundaries, encompassing a 12–mile square tract, were provisionally determined. President Ulysses S. Grant, in an 1876 executive order, formally defined the borders of the Reservation, which was also referred to as "the Square." *See Jessie Short v. United States,* 202 Ct.Cl. 870, 874, 486 F.2d 561 (1973). By executive order of President Benjamin Harrison, the Reservation was extended in 1891. The territory added to the Reservation has been referred to as "the Addition." *See id.* From the beginning of the Reservation until the present, the Square has been dominated by the Hoopa Valley Tribe ("Hoopa"), and the Addition by the Yurok, with the Karuk dispersed in both areas.

A dispute over which Indians had rights to revenues generated from sales of timber on the Square was the basis of *Jessie Short v. United States,* 202 Ct.Cl. 870, 486 F.2d 561 (1973) (*"Short I "*), 228 Ct.Cl. 535, 661 F.2d 150 (1981) (*"Short II "*), 719 F.2d 1133 (Fed. Cir.1983) (*"Short III "*), and 12 Cl.Ct. 36 (1987) (*"Short IV "*). In *Short I,* the Court of Claims held that none of the Indians on the Reservation had a superior right to the revenues generated by the sale of timber cut from the Square, regardless of whether the Indian lived on the Square or the Addition. *See Short I,* 202 Ct.Cl. at 884–85, 486 F.2d 561. Following that lengthy litigation, Congress in 1988 passed the Hoopa–Yurok Settlement Act of October 31, 1988 ("1988 Act"), 25 U.S.C. § 1300i *et seq.* The 1988 Act partitioned the Reservation, granting the use of the Square to the Hoopa as a reservation, and giving the use of the Addition to the Yurok for a reservation. The Karuk were not given any of the Reservation for use as their own.

The 1988 Act's partitioning of the Reservation instigated this litigation.

## DISCUSSION

Plaintiffs contend that the 1864 Act vested their ancestors or tribes with compensable rights in the Reservation. As a result, plaintiffs claim they have been subject to a taking under the Fifth Amendment to the United States Constitution, which forbids the taking of property by the government without just compensation. The Yurok contend they had a compensable expectancy in the Square taken away by the 1988 Act. The Karuk claim their vested interest in the entire Reservation was deprived by the 1988 Act. Finally, the Ammon Group claim their vested rights in the Reservation were destroyed without compensation by the 1988 Act. The United States has filed a motion for summary judgment, alleging that plaintiffs do not possess a compensable expectancy in the Reservation because the 1864 Act did not grant vested property rights to the Indians, and that plaintiffs are collaterally estopped from relitigating the issue of vested property rights, which, defendant contends, was resolved in *Short I.* Defendant-intervenor, the Hoopa, has joined in the United States's motion.

Plaintiffs oppose defendant's motion and have separately filed cross-motions for summary judgment,[1] arguing that as a matter of law they have compensable expectancies in the Reservation through the 1864 Act, or alternatively on grounds such as legislative

---

1. Although the Yurok and the Ammon Group both filed cross-motions for summary judgment after the United States and the Hoopa filed their motion for summary judgment, the Karuk filed its own motion for summary judgment shortly after defendant and defendant-intervenor filed their motion.

intent, various Indian tribes' understanding of the situation, the fact that plaintiffs were aboriginal residents of the land, provision by the federal government of education, health care, and welfare, allotment of land to individual Indians, and general monitoring of social conditions on the Reservation. The Ammon Group also alleges that defendant and defendant-intervenor are collaterally estopped by *Short I* from denying plaintiffs' vested interests in the Reservation.

Though the court does not find any party's collateral estoppel argument to be persuasive, it chooses not to address that issue because the takings issue is dispositive.

### I. *Governing Principles*

■ In order for a plaintiff to invoke the Fifth Amendment Takings Clause, it must establish a "historically rooted expectation" of compensability in the property alleged to have been taken. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027–28, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *California Hous. Sec., Inc. v. United States*, 959 F.2d 955, 958 (Fed.Cir.1992). The range of interests qualified for protection under the Fifth Amendment is defined by the "existing rules or understandings that stem from an independent source such as state law," *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and the "relevant background principles." *Lucas*, 505 U.S. at 1030, 112 S.Ct. 2886; *see also Preseault v. United States*, 27 Fed.Cl. 69, 88, 89 (1992).

■ Congress holds exclusive power to dispose of public lands of the United States. *See* U.S. Const. art. IV, § 3 ("The Congress shall have Power to dispose of . . . the Territory or other Property belonging to the United States."). Any power of the executive to convey an interest in public lands must be traced to a clear delegation of Congress's Article IV power. *See Sioux Tribe v. United States*, 316 U.S. 317, 325–26, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942). Thus, when "Congress intends to delegate power to turn over lands to the Indians permanently, one would expect to and doubtless would find definite indications of such a purpose." *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 104, 69

S.Ct. 968, 93 L.Ed. 1231 (1949). Silence cannot be construed as congressional intent to convey such powers to the executive, nor can it be taken as acquiescence in an executive act that appears to convey a permanent interest. *See Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 176, 177–78, 67 S.Ct. 650, 91 L.Ed. 823 (1947).

■ Unless recognized as vested by some act of Congress, tribal rights of occupancy and enjoyment, whether established by executive order or statute, may be extinguished, abridged, or curtailed by the United States at any time without payment of just compensation. *See Tee–Hit–Ton Indians v. United States*, 348 U.S. 272, 278–79, 75 S.Ct. 313, 99 L.Ed. 314 (1955); *Hynes*, 337 U.S. at 103–04, 69 S.Ct. 968; *United States v. Southern Pac. Transp. Co.*, 543 F.2d 676, 687 (9th Cir.1976). Until title is "recognized," it cannot be said that a plaintiff has the historically rooted expectation of compensability necessary to recover in an action for just compensation. *See id.* Recognition of title may be established through various means:

> There is no particular form for congressional recognition of Indian right of permanent occupancy. It may be established in a variety of ways but there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation.

*Tee–Hit–Ton Indians*, 348 U.S. at 278–79, 75 S.Ct. 313 (citing *Hynes*, 337 U.S. at 101, 69 S.Ct. 968).

■ Lack of recognized title has often been found when the land involved, such as the Reservation, has been withdrawn from the public domain by executive order. Federal courts have long held that where a reservation is created by executive order, and without congressional recognition of vested tribal ownership rights, the United States is not liable for a taking if it later modifies the rights of those living on the land. *See Hynes*, 337 U.S. at 103–04, 69 S.Ct. 968; *Southern Pac. Transp. Co.*, 543 F.2d at 685–87. As the Supreme Court reasoned,

> [a]n Indian reservation created by Executive Order of the President conveys no right of use or occupancy to the beneficia-

ries beyond the pleasure of Congress or the President. Such rights may be terminated by the unilateral action of the United States without legal liability for compensation in any form....

*Hynes*, 337 U.S. at 103, 69 S.Ct. 968.

Through a lengthy examination of the 1864 Act, its legislative history, as well as both prior and subsequent actions, this court finds that Congress did not bestow upon plaintiffs or their ancestors any permanently vested property rights to the Reservation, nor did it give the executive the power to do so. Further, none of Congress's later actions or conferring of benefits created a vested interest. The court therefore holds that plaintiffs never had a compensable expectancy in the Reservation, and the 1988 Act accordingly did not violate the Takings Clause.

## II. The 1864 Act

When a court is asked to decide the meaning of a statute, the first point of analysis is the language of the statute. As the Supreme Court has reasoned, "[o]ur task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.'" *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (citations omitted); *see also Negonsott v. Samuels*, 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993).

When Congress intends to convey vested title in land, it uses express language of permanence, and clearly identifies the beneficiaries. As the Court said in *Hynes*,

[w]hen a reservation is established by a ... statute, the quality of the rights thereby secured to the occupants of the reservation depends upon the language or purpose of the congressional action.

*Hynes*, 337 U.S. at 103, 69 S.Ct. 968; *see also Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 655–56, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976).

The 1864 Act is devoid of express language vesting permanent ownership rights. The key statutory provision of the 1864 Act states that

there shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said state, to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state....

13 Stat. at 40. This grant of authority to the President was closely examined by the Supreme Court in *Donnelly v. United States*, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913). There, the Court concluded that the 1864 Act showed Congress's intent to confer merely a discretionary power upon the executive. *See id.* at 256, 33 S.Ct. 449. This decision was based on two factors. First, the Court noted that the state of Indian affairs within California in 1864 was such that

Congress could not reasonably have supposed that the President would be able to accomplish the beneficent purposes of the enactment if he were obligated to act, once and for all, with respect to the establishment of the several new reservations that were provided for, and were left powerless to alter and enlarge the reservations from time to time, in the light of experience.

*Id.* at 256–57, 33 S.Ct. 449.

Second, the Court noted that beginning shortly after the passage of the 1864 Act, both Congress and the President construed the Act as conferring a continuing discretionary authority upon the executive branch. *See id.* at 257, 33 S.Ct. 449. To illustrate this point, the Court cited subsequent governmental actions which enlarged, reduced, or abolished reservations created pursuant to the 1864 Act. The Court also noted that when land from 1864 Act reservations had been restored to the public domain, it had not created any liability on the part of the government. *See id.* at 258, 33 S.Ct. 449.

The meaning of the 1864 Act was further examined by the Court of Claims in *Short I*, which held that

[t]he powers conferred by this statute are to be construed in keeping with the broad connotations of the words employed: "at his discretion," "suitable extent," "accommodations of the Indians," "practicable,"

and "due regard." ... It is not disputed that the President had complete discretion as to which tribes were to be located on any of the reservations. The number of the tribes to occupy a reservation was also a matter for Presidential decision.... How many tribes was left to the President; the President would in his discretion adjust the size of a reservation to the number of tribes and Indians to be accommodated.

Given such a statutory scheme, faithfully reflected by the omission of reference to any Indian tribe in the notices of 1864–65 and the executive order of 1876, the Hoopa Indians could get no vested or preferential rights to the Square from the fact alone of being the first or among the first to occupy the Square with Presidential authority.... Any exercise of the President's discretion in favor of the Hoopas, in approving their residence on the reservation, gave the Hoopas no vested rights as against such other tribe as might be the beneficiary of a simultaneous or subsequent exercise of the President's discretion.

*Short I*, 202 Ct.Cl. at 877–78, 486 F.2d 561 (citations omitted). As a result, the *Short I* court determined that "[n]o vested Indian rights in the Square existed." *Id.* at 884, 486 F.2d 561.

Additionally, the 1864 Act states unequivocally that the Reservation land is "to be retained by the United States." 13 Stat. at 40. If Congress had intended to vest plaintiffs or their ancestors with compensable expectancies in the Reservation, it would not have included such a clear provision preserving the property for the United States.

Consequently, as both the Supreme Court and the Court of Claims have stated, the plain meaning of the 1864 Act afforded no tribe a compensable expectancy in the Reservation, but instead subjected its inhabitants to the exercise of both the Congress and the President's discretionary power. *See id.; see also Hynes*, 337 U.S. at 103–04, 69 S.Ct. 968; *Healing v. Jones*, 174 F.Supp. 211, 216 (D.Ariz.1959); 210 F.Supp. 125 (D.Ariz.1962) (three judge panel), *aff'd*, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963).

*III. Legislative History*

The legislative history of the 1864 Act shows even more clearly that Congress lacked the intent to vest a permanent expectancy for the plaintiffs' in the Reservation. The Act, introduced into Congress as Senate Bill 80 ("S.80"), was not the first attempt to bring order and efficiency to the handling of California Indians. Instead, it was the reformulation of a bill that had failed to gain legislative approval in the prior year. Thus, insight into the intent of Congress can be gained through comparing the two bills and the debate surrounding each of them.

In 1863, Senate Bill 501 ("S.501") was introduced by California Senator James A. McDougall. The bill provided, among other things, for abandonment and public sale of two reservations in California, and the establishment of a single reservation in California's Round Valley. Under S.501, the new reservation was to be for the "perpetual use and occupation" of all the Indians from the interior of the northern half of California. *See* Cong.Globe, 37th Cong., 3d Sess. 1302 (1863). Ultimately the bill was amended to have a reservation created at Round Valley to hold all the Indians of the northern portion of California. *See id.* The bill passed the Senate, and then was debated in the House. *See id.;* Cong.Globe, 37th Cong., 3d Sess. 1486–87 (1863). There, some representatives questioned the authority of the government to unilaterally take Indian reservation land and sell it to the public. Representative Phelps of California answered these questions, stating that "[t]hese districts of country of which we speak as Indian reservations, are not Indian reservations such as we speak of on this side of the Rocky mountains. The title to the lands is in the General Government, and not in the Indians." *Id.* at 1487. Further, Representative Aaron Sargent of California said, "[t]here have been no treaties with the Indians of California," but the government "has proceeded upon an entirely different theory, recognizing the Indians are entitled to protection and reasonable support, but not as owners of the soil." *Id.* Despite these statements, the bill was never passed by the House. *See id.*

In 1864, S.80 was introduced by Senator John Conness. This bill, which became the 1864 Act, omitted several key components of the earlier, failed S.501. Most importantly, S.80 did not include S.501's provision that the reservation land be set aside for the perpetual use and occupation of the Indians. Instead, S.80 included language which gave the President discretion and flexibility in handling the California Indian situation.[2] In advocating passage of S.501, Senator Doolittle reminded the Senate that up until then the system had been "too indefinite, too expensive, too loose in its administration," Cong.Globe, 38th Cong., 1st Sess. 1209 (1864), and that, as Senator Conness stated, "this bill proposes economy in the Indian affairs of California." Cong.Globe, 38th Cong., 1st Sess. 1184 (1864). The same economic based reasoning was used in the House, and S.80 ultimately passed and became the 1864 Act. *See id.*

Thus, the legislative history is devoid of evidence that supports plaintiffs' contention that the 1864 Act vested them with compensable expectancies in the Reservation. Instead, language which would have given the Indians a reservation for "perpetual use and occupation," included in the failed S.501, was omitted from the 1864 Act.

*IV. Congressional Actions Subsequent to the 1864 Act*

The inquiry concerning any post-authorization congressional recognition or vesting of Indian title to the Reservation focuses upon the clear intent of Congress in its actions relating to the Reservation after 1864. Although there is no general test, in order for such a vesting to occur, "there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation." *Tee–Hit–Ton Indians,* 348 U.S. at 278–79, 75 S.Ct. 313. Here too plaintiffs have failed to show that congressional actions had the required definite intention to create a compensable expectancy in the Reservation for any tribe.

Plaintiffs cite the acts of March 3, 1865, July 27, 1868, and April 10, 1869, which appropriated funds to the Reservation, as evidence of Congress's intent to grant a permanent, compensable expectancy. These acts, however, do not offer any proof of such a definite intention by Congress, but instead merely appropriated funds to purchase improvements and personal property of settlers in the Hoopa Valley, as well as for food, clothing, and various other needs of the Indians on the Reservation. *See* Act of March 3, 1865, 13 Stat. 538; Act of July 27, 1868, 15 Stat. 198, 221; Act of April 10, 1869, 16 Stat. 36, 37. None of these acts discusses tribal title or occupancy of the Reservation, names beneficiaries, or otherwise demonstrates any definitive intent by Congress to confer permanent rights on the Indians occupying the Reservation. *See Tee–Hit–Ton Indians,* 348 U.S. at 278–79, 75 S.Ct. 313.

Contrary to plaintiffs' contentions, the 1887 General Allotment Act ("1887 Act"), codified at 25 U.S.C. §§ 331–354, also fails to provide recognition of compensable rights in executive order reservations. As the Supreme Court reasoned when it rejected a similar argument made by the Sioux Tribe regarding the 1887 Act, it

> meant no more than that Congress was willing that the lands within [the executive order reservations] should be allotted to individual Indians according to the procedure outlined. It did not amount to a recognition of tribal ownership of the lands prior to allotment.

*Sioux Tribe of Indians,* 316 U.S. at 330, 62 S.Ct. 1095.

Further, plaintiffs' reliance on the Act of June 17, 1892, 27 Stat. 52 ("1892 Act"), which opened the former Klamath River Reservation to settlement by non-Indians, is also inappropriate. As has already been adjudicated in *Short I,* that act was "not intended or understood . . . to have any bearing on the rights of the residents of the Hoopa Valley Reservation." *Short I,* 202 Ct.Cl. at 979, 486 F.2d 561 (finding 185).

---

**2.** Examples of this flexibility included authorizing the President to create up to four reservations of "suitable extent for the accommodation of the Indians" and located as "remote from the white settlements as may be found practicable." Act of April 8, 1864, 13 Stat. 39, 40.

Plaintiffs also fail to establish any definite congressional intent to confer permanent rights through the Indians of California legislation, Act of May 18, 1928, 45 Stat. 602, 25 U.S.C. § 651 *et seq.* ("1928 Act"). Contrary to plaintiffs' claims, this act was merely jurisdictional in nature, authorizing initiation of a suit to determine an "equitable amount due [all the Indians of California] from the United States." 25 U.S.C. § 652. The 1928 Act did not, however, express any view on the nature of the rights Indians had in existing reservations. Instead, it merely recognized "an equitable claim" by the Indians for lands previously taken from them. *See Indians of Cal. v. United States,* 98 Ct.Cl. 583, 599–600, 1942 WL 4378 (1942). Nowhere in the 1928 Act did Congress discuss any intent of earlier congressional acts to permanently turn over lands to the Indians. *See Donahue v. Butz,* 363 F.Supp. 1316, 1323 (N.D.Cal.1973).

Plaintiffs' reliance on *Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), is also misplaced. Plaintiffs have cited *Mattz* for a looser definition of "recognition" than the *Tee–Hit–Ton* requirements of definitive intent by Congress. *See id.,* at 505, 93 S.Ct. 2245. In *Mattz,* however, the Court was confronted with the question of jurisdictional status of the old Klamath Indian Reservation, an issue very different from ownership rights. The Court's inquiry focused on determining the boundaries of the reservation, and thus the Court recognized the limits of state jurisdiction over Indians. *See Mattz,* 412 U.S. at 504–06, 93 S.Ct. 2245; *see also* 18 U.S.C. § 1151 (stating that "the term 'Indian country' ... means (a) all land within the limits of any Indian reservation ... notwithstanding the issuance of any patent"). The Court did not address the issue of vested property rights. *See Mattz,* 412 U.S. at 504–06, 93 S.Ct. 2245. Indeed, the Court in *Mattz* did not cite *Tee–Hit–Ton* and its standard for recognition anywhere in its opinion, and instead used the word "recognized" to mean awareness or cognition that a reservation of some kind existed. *See Mattz,* 412 U.S. at 505, 93 S.Ct. 2245. Thus, as the Court of Claims said in *Short I, Mattz* decided different issues than those now before the court. *See Short I,* 202 Ct.Cl. at 873, 486 F.2d 561.

Plaintiff Yurok also argues that the continuous occupancy, reliance, and use of the Reservation established a compensable expectancy. Citing *United States v. Shoshone Tribe of Indians,* 304 U.S. 111, 115–16, 58 S.Ct. 794, 82 L.Ed. 1213 (1938), the Yurok argue that long standing occupation of the Reservation created a compensable interest. Plaintiff Yurok, however, has inappropriately relied upon *Shoshone* for this proposition. In *Shoshone,* the tribe's right of occupancy stemmed from a ratified treaty that stated that the land would be "set apart for the absolute and undisturbed use and occupation of the Shoshone Indians," and that no other person would be permitted to occupy the territory. *Shoshone,* 304 U.S. at 113, 58 S.Ct. 794. That treaty, and the language it contains, are distinct from the language used in the executive order that created the Reservation in this matter. Thus, any right plaintiffs may have to stay on the Reservation pursuant to the 1864 Act is a statutory authorization subject to new congressional legislation altering or eliminating that privilege. *See Allred v. United States,* 33 Fed.Cl. 349, 356 (1995). Further, as the Supreme Court has stated, unilateral reliance upon the use of federal lands, such as is the case here, cannot form the basis for a compensable property interest. *See Tee–Hit–Ton,* 348 U.S. at 284–85, 75 S.Ct. 313.

The fact defendant provided federal benefits and services to the Indians on the Reservation also did not create a vested expectancy. Plaintiff Karuk argues that provision of federally sponsored benefits, such as schools to educate Indian children, field matrons, health and welfare services, administering of allotment programs for individual Indians, as well as monitoring social conditions on the Reservation, created a compensable interest. Such services, however, did not vest such an expectancy. Instead, these benefits, which were offered to other reservations as well, were merely gratuitous, did not bind defendant in any way, and could be altered or eliminated at any time. *See, e.g., Bowen v. Gilliard,* 483 U.S. 587, 604–05, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987); *Richardson v. Belcher,* 404 U.S. 78, 80–81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).

The lack of a compensable expectancy in the Reservation is further supported by the way Congress handled other 1864 Act reservations. In 1873, Congress restored to the public domain part of the Round Valley Reservation, which had been created under the 1864 Act. *See* Act of March 3, 1873, 17 Stat. 633 ("1873 Act"); *Russ v. Wilkins,* 410 F.Supp. 579, 580 (N.D.Cal.1976), *rev'd in part,* 624 F.2d 914 (9th Cir.1980). Instead of acknowledging or paying off any vested interest of the Indians, Congress provided in the 1873 Act that the proceeds of the sales from the reservation lands be

> used to pay for the improvements and claims of settlers now residing within the limits of the new reservation created under this act, and for improvements of Indians on lands hereby restored to the public lands, after such improvements shall have been appraised and the appraisement approved, as hereinafter provided.

Act of March 3, 1873, 17 Stat. at 634.

Congress's handling of another 1864 Act reservation, the former Klamath River Reservation, similarly shows that the 1864 Act did not create any compensable expectancy for the plaintiffs in the Reservation. In 1892, Congress passed an act which opened the Klamath River Reservation for sale to settlers. *See* Act of June 17, 1892, 27 Stat. 52, 52. There, unlike the 1873 Act, Congress provided express language that stated that the proceeds of the sale were to be used for the benefit of the resident Indians. *See* Act of June 17, 1892, 27 Stat. at 53. The fact Congress decided to specifically include a proviso allocating proceeds to the Indians is additional evidence that Congress did not believe it had created a compensable expectancy through the 1864 Act.

This lack of a compensable interest in the Reservation is even more clear when compared with another Indian related act of 1864. Less than one month after the 1864 Act was approved, Congress passed the Act of May 5, 1864, 13 Stat. 63, which created a reservation for Indians in Utah. Using language very different from that used in the 1864 Act, this act provided that the

> superintendent of Indian affairs for the territory of Utah be, and he is hereby, authorized and required to collect and settle all or so many of the Indians of said territory as may be found practicable in the Uinta valley, in, said territory, which is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same.

Act of May 5, 1864, 13 Stat. 63, § 2. Unlike the non-vesting language used in the 1864 Act, the clear, definitive statutory language of the May 5, 1864 Act established a permanent home for the Ute Indian Tribe. *See Ute Indian Tribe v. Utah,* 773 F.2d 1087, 1088 (10th Cir.1985). Thus, if Congress had wanted to vest the plaintiffs or their ancestors with compensable expectancies in the Reservation, it clearly knew what language to use.

## V. Actions Prior to the 1864 Act

 Plaintiffs also attempt to show a vested interest in the Reservation through various Indians' understanding of the treaties signed between the United States and several California tribes in 1851 and 1852. Although the United States did negotiate numerous treaties with California tribes during those two years, none of the treaties was ever ratified by the Senate. *See Indians of Cal.,* 98 Ct.Cl. at 588–89; *Short I,* 202 Ct.Cl. at 895–96, 486 F.2d 561. As a result, these treaties cannot have binding effect upon defendant. *See* U.S. Const. art. II, § 2 (stating that the President shall "have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur").

 In another attempt to assert a compensable expectancy, plaintiff Yurok claims that it has aboriginal title to the territory which became the Reservation, and thus is entitled to compensation for the 1988 Act. This argument fails as well, however, for it has long been acknowledged by the courts that aboriginal title may be "terminated" by the sovereign "without any legally enforceable obligation to compensate the Indians." *Tee–Hit–Ton,* 348 U.S. at 279, 75 S.Ct. 313. Indeed, as the Supreme Court has held, aboriginal title constitutes no more

than permissive title, which is "vulnerable to affirmative action by the sovereign, which possesse[s] exclusive power to extinguish the right of occupancy at will." *United States v. Alcea Band of Tillamooks,* 329 U.S. 40, 46, 67 S.Ct. 167, 91 L.Ed. 29 (1946); *see also United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 345, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941).

### CONCLUSION

For the foregoing reasons, plaintiffs have failed to establish that they had a vested, compensable expectancy in the Reservation. Therefore, the Fifth Amendment protection against unlawful takings of property was not invoked by the 1988 Hoopa–Yurok Settlement Act. Plaintiff Karuk's motion for summary judgment, as well as the cross-motions for summary judgment by plaintiffs' Yurok and the Ammon Group, are denied. The motion and cross-motions for summary judgment of defendant and defendant-intervenor, the United States and the Hoopa Valley Tribe, are granted. The Clerk will dismiss the complaints. Costs for defendant.