### UNITED STATES v. SANTA FE PAC. R. CO.
### No. 9271.

Circuit Court of Appeals, Ninth Circuit.

Aug. 30, 1940.

Norman M. Littell, Asst. Atty. Gen., Norman MacDonald and Charles R. Denny, Attys., Dept. of Justice, both of Washington, D. C., Richard H. Hanna, Sp. Asst. to Atty. Gen., of Albuquerque, N. M., and Harlow Akers, Sp. Asst. to Atty. Gen., of Phoenix, Ariz., for appellant.

Charles H. Woods and Joyce Cox, both of Chicago, Ill., and Fennemore, Craig, Allen & Bledsoe, of Phoenix, Ariz., for appellee.

Before WILBUR, MATHEWS, and HEALY, Circuit Judges.

WILBUR, Circuit Judge.

This suit was brought by the United States in its own behalf and as guardian of the Walapai[1] Tribe of Indians of Arizona to enjoin the defendant, Santa Fe Pacific Railroad Company (hereinafter called the Santa Fe Railroad Company, or, the Railroad Company) from interfering with the alleged possessory rights of that tribe to certain lands in northwestern Arizona.

The lands to which these possessory rights are claimed were included within the grant made to defendant's predecessor, the Atlantic and Pacific Railroad Company, by Act of Congress of July 27, 1866, 14 Stat. 292. This act granted the odd-numbered sections of land within specified distances on each side of the line of railroad to be constructed, the specific sections to be identified later. This identification was fixed March 12, 1872, when the map of the proposed railroad was filed and accepted.

In 1865 a reservation for the Walapai Tribe was created by Congress, 13 Stat. 559, on lands on the lower Colorado River not within the limits of the railroad grant.

In 1883 another reservation for this tribe was created by proclamation of President Arthur. This reservation was in northwest Arizona and included lands covered by said railroad grant.

The complaint contains two counts: the first, for interference with the possession of lands within the boundaries of the reservation created in 1883; the second, for interference with the possession of lands within the odd numbered sections outside this reservation and within the limits of the grant.

Defendant moved to dismiss the complaint on the ground that it failed to state a cause of action, in that matters of which the court took judicial notice showed that the Walapai Tribe had no possessory rights as alleged. The court granted the motion and the plaintiff appeals.

The act of 1866 limited its grant of alternate sections with these words: "whenever * * * the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights". Literally this requires that no section is within the grant unless it is free from "all other claims or rights" and certainly a right of possession would fall within that description. A logical consequence of that interpretation would be that if the Walapai Tribe had their alleged possessory rights the lands to which they applied were not covered by the grant and the Railroad Company would be entitled

---

[1](Variously spelled Hualpai, Hualapai, or Walapai, etc.)

to lieu lands. Act of 1866, sec. 3. However, in construing a similar grant of lands in Dakota, made by Congress July 2, 1864, 13 Stat. 365, to the Northern Pacific Railroad, in Buttz v. Northern Pacific Railroad Co., 119 U.S. 55, 7 S.Ct. 100, 107, 30 L.Ed. 330, the Supreme Court held that an identical limitation did not exclude from the grant lands to which the Indians had a right of occupancy only. This conclusion was partly based upon the provision in the granting act wherein the United States agreed to extinguish the Indian title to all lands falling under the operation of the act. The same provision is in the granting act to the Atlantic and Pacific. Sec. 2, Act of July 27, 1866, 14 Stat. 292, 294. The Supreme Court said: "In our judgment, the claims and rights mentioned in the third section are such as are asserted to the lands by other parties than Indians, having only a right of occupancy."

The word "occupancy" is used interchangeably with "possession" in appellant's brief.

Appellant concedes that the grant of 1866 to defendant's predecessor in interest, the Atlantic and Pacific Railroad Company passed the fee to the lands in question; but it contends nevertheless that the grant was subject to the Tribe's possessory rights in whatever lands they actually occupied.

The first question then is as to the origin of the right of Indian occupancy which is herein asserted to be superior to the railroad grant. The right, if any, at the time the grant became effective in March, 1872, is the one involved for after the grant vested it could not be subsequently divested by any act of the government or of the Indians.

Appellant argues that there is uniform governmental policy of recognizing rights of occupation as vested in all Indian tribes with respect to land actually occupied by them at the time they were brought under the sovereignty of the United States and that such rights were good against all but the government of the United States. It must be conceded that this view is consistent with what has been the common practice in dealing with the Indians occupying lands other than lands within the area ceded by Mexico to the United States. Cf. Bates v. Clark, 95 U.S. 204, 24 L.Ed. 471; Spalding v. Chandler, 160 U.S. 394, 402, 403, 16 S.Ct. 360, 40 L.Ed. 469. Their practice has been based upon the policy of maintaining just and peaceable relations with the Indians and is discussed and considered in a number of early cases, such as Johnson and Graham's Lessee v. McIntosh, 8 Wheat. 543, 5 L.Ed. 681, decided in 1823.

But, since the whole of the Indians' title depends entirely upon the policy of the federal government, it is obvious that what may have seemed the best policy in dealing with Indians in territories acquired prior to the treaty of Guadalupe Hidalgo might not have seemed the best policy in dealing with Indians occupying the area ceded by Mexico in that treaty.

Appellee argues that since, apart from exceptional instances as in case of the lands of the Pueblo Indians, the Mexican government recognized no rights in the Indians with respect to lands in this area at the time of the cession, they cannot be deemed to have acquired any such rights of possession in the absence of affirmative action by the United States. To this appellant replies that there is no sound reason for assuming a discrimination against the Indians of the Mexican cession. In support of appellant's contention a case decided by this court, United States v. Walker River Irrigation District, 9 Cir., 104 F.2d 334, is cited; but that case merely recognized that the government was under a moral obligation to the Indians of the ceded area of such a nature that the creation of an Indian reservation therein must have carried with it the right to the use of water from a stream within the reservation, water without which the land reserved would be worthless. It is obvious, however, that this case throws little light upon the possessory rights of Indians within the Mexican cession.

Since it is conceded that the title of the United States was absolute, except in certain cases of specific grants, and since there is no all-embracing rule governing the possessory rights of the Indians upon the public domain, their rights within the territory ceded by Mexico must be neither more nor less than what the government, whether justly or unjustly, chose to recognize. And that must be determined from the course of governmental action, as contended by appellee. That question we will now consider.

One of the most significant pieces of legislation by Congress in this connection is the Act of July 22, 1854, 10 Stat.

308, establishing the offices of Surveyor-General of New Mexico, Kansas and Nebraska. This act (sec. 2) provided for a donation of 160 acres of land to certain settlers. It excepted from the land subject to donation lands claimed under the laws, usages and customs of Spain and Mexico.[2]

While as to Nebraska and Kansas the Act provided that the only land subject to preemption under the preemption act of September 4, 1841, 5 Stat. 453, was land to which the "Indian title" had been or should be extinguished (Sec. 12 of Act of 1854, supra), the Act further provides in Sec. 13, "that the public lands in the Territory of Nebraska, to which the Indian title shall have been extinguished, shall constitute a new land district to be called the Omaha District; and the public lands in the Territory of Kansas, to which the Indian title shall have been extinguished, shall constitute a new land district."

It seems clear from the foregoing provisions of the Act that Congress recognized in the territory of New Mexico only those Indian rights which existed under Spanish or Mexican law at the time of the cession of the land to the United States by Mexico.

In 1870 Congress provided for the appointment of a Surveyor-General for Arizona and charged him with the duty of investigating Spanish and Mexican land titles therein, in the same manner as the Surveyor-General of New Mexico had done under the Act of 1854. Appropria-

tion Act, July 15, 1870, 16 Stat. 291, 304. This Act is significant here only as indicating a continuing policy of recognizing only rights in land theretofore existing in the ceded territory.

On March 3, 1871, Congress enacted a statute prohibiting future treaties with Indian Tribes, 16 Stat. 544, 566, 25 U.S.C.A. § 71, thus asserting the right of the government thereafter to define the rights of Indians with or without their consent.

In 1865 Congress validated an agreement made between Arizona's first Indian superintendent and the Walapai and certain other tribes for the establishment of a reservation of 75,000 acres "from Half-Way Bend to Corner Rock on the Colorado River." (Act of March 3, 1865, 13 Stat. 541, 559). If at that time Congress regarded this whole vast area of Arizona as a body of land to which the Indians in actual occupation had possessory rights which it purposed to continue to recognize it is difficult to understand why it should have created this reservation. This act of March 3, 1865 is far more consistent with an intent to limit the possessory rights of Indians on the Colorado River and its tributaries to the reservation thus created.

Entirely consistent with this view and difficult to understand on any other ground is the Act of July 27, 1866, granting land to the Atlantic and Pacific Railroad Company to finance the construction of the proposed railroad. It must be re-

[2] The act provided that the Surveyor-General of New Mexico, under instructions given by the Secretary of the Interior, should "ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico * * *. He shall make a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo, of eighteen hundred and forty-eight, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States; and shall also make a report in regard to all pueblos existing in the Territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos, respectively, and the nature of their titles to the land. * * * Until the final action of Congress on such claims, all lands covered thereby shall be reserved from sale or other disposal by the government, and shall not be subject to the donations granted by the previous provisions of this act." Section 8.

On August 21, 1854, the Commissioner of the Land Office, acting with the approval of the Secretary of the Interior, instructed the Surveyor-General of New Mexico, which then included the land now in question, to recognize no title or right in the land that was not recognized by Mexico before the cession as follows:

"It is obligatory on the Government of the United States to deal with the private land titles, and the 'pueblos,' precisely as Mexico would have done had the sovereignty not changed. We are bound to recognize all titles as she would have done—to go that far, and no further. This is the principle which you will bear in mind in acting upon these important concerns." Donaldson, The Public Domain, 398.

membered that this act granted lands to the Railroad Company "for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast * * *." Section 3. But the fee in a section of land in which a tribe of Indians had a legal right of exclusive occupation would obviously be worth nothing to the railroad or its purchaser. With such an encumbrance no land could be sold and the purpose of the grant would be utterly defeated. In United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 797, 82 L.Ed. 1213, a case involving a treaty right of an Indian tribe to possession of land, the court said: "For all practical purposes, the tribe owned the land. Grants of land subject to the Indian title by the United States, which had only the naked fee, would transfer no beneficial interest."

This seemingly insurmountable difficulty is met by appellant with the argument that, as in the case of the Northern Pacific grant, already discussed, this act specifically provided (in Sec. 2) that "the United States shall extinguish, as rapidly as may be consistent with public policy and the welfare of the Indians, and only by their voluntary cession, the Indian title to all lands falling under the operation of this act."

A consideration of the act granting to the Railroad Company as a whole indicates an intent on the part of Congress to avoid defining the Indian rights affected by the railroad. Certainly Congress did not intend in the act, for the benefit of the Railroad Company, to create new and theretofore unrecognized rights in Indians, adverse to the rights of the grantee. Throughout the territory traversed by this railroad, and others to which similar grants had been made, there were Indian treaty rights of various sorts, and possessory rights and reservation rights. The debates in Congress, published in the Congressional Globe for March 1 and 2, 1866, relating to the interpretation of this act, indicate a purpose to deal only with existing Indian rights, whatever they might be and wherever situated.

The government relies so strongly upon the holding of the Supreme Court in Buttz v. Northern Pacific Railroad Co., supra, as recognizing and declaring a possessory right in favor of all Indians in possession of government land otherwise undisposed of as to call for a further analysis of that decision. The action was brought by the Railroad Company to recover possession of a small tract of land in the Territory of Dakota, claimed by it under a grant made in 1864 by Act of Congress. The defendant claimed under the preemption law of 1841. The land, said the court, was within "what is known as 'Indian Country.' At the time the act of July 2, 1864, was passed, the title of the Indian tribes was not extinguished. But that fact did not prevent the grant of congress from operating to pass the fee of the land to the company. The fee was in the United States. The Indians had merely a right of occupancy,—a right to use the land subject to the dominion and control of the government. The grant conveyed the fee subject to this right of occupancy. The railroad company took the property with this incumbrance."

The court went on to say: "In the grant to the railroad company now before us, congress was not unmindful of the title of the Indians to the lands granted, and it stipulated for its extinguishment by the United States as rapidly as might be consistent with public policy." The opinion then recounts various steps taken by the government in fulfilling this policy, steps resulting in the final retirement of the Indians to established reservations and a payment to them for the relinquishment of their claim to possessory rights over the area, including the land in dispute.

Thus it appears that the only thing actually decided by this Northern Pacific case was that by virtue of the grant of 1864 to it and the subsequent extinguishment of the Indians' possessory rights, the Railroad Company acquired not only the fee but a right of possession as against one claiming a right accruing after the grant under the Preemption Act. It decided nothing as to the origin or extent of the Indian rights prior to the Act of 1864. However, though not necessary to the decision, because the right, if any, had been extinguished, the court clearly recognized that the Indians had an undefined right to possession over area on either side of the railroad which it designated as "Indian country" which did not pass to the Railroad Company with the grant of the fee in the Act of 1864 and was not lost until finally surrendered at a later date.

That case did not deal with lands in the territory ceded by Mexico which has a different history of governmental action,

Spanish, Mexican and United States. Some of these facts we have already considered, but much of the history cited relates to governmental action after the grant of July 27, 1866.

The Acts above enumerated, it will be observed, were all enacted prior to 1872 when the Railroad Company's rights in the land grant vested. These statutes recognized no rights of the Indians in Arizona other than those existing under Mexican law or created by reservations after the Mexican cession to the United States. These rights did not include possessory rights of Indians. No other Acts of Congress recognized such possessory rights. The rights claimed by the plaintiff on behalf of the Indians were dependent upon a recognition thereof by the United States government. They were not recognized. Even if such rights were recognized and thus given substance they would be extinguished by later non-recognition. There is thus a clear distinction between the possessory rights of Indians in the territory ceded by Mexico and other areas within the United States derived from other sovereigns wherein Indian rights of possession had always been recognized by that sovereign and continued to be recognized by the United States.

Reference has already been made to the creation of a reservation for the Walapai in 1854–1855. In 1867 the agent at La Paz, Arizona, reported that lack of funds had prevented bringing the Walapai to their reservation. But in 1872, acting under the authority of President Grant, General Howard ordered all Indians in that section of the country to go to their respective reservations. In 1874 the Walapai were forcibly taken to their reservation. There could not be a more effective denial of the possessory rights of the Walapai to lands outside their reservation than this act of forcible expulsion from such lands by executive action in accordance with the Act of Congress creating the reservation. 13 Stat. 541, 559 supra; cf. Buttz v. Northern Pacific R. Co., supra.

What has just been said also applies to the second cause of action which concerns lands outside of any Indian reservation; but it is equally applicable to the first cause of action which concerns lands within the reservation which was created for the Walapai in 1883 by Presidential proclamation, subsequently ratified by Congress (Act of February 20, 1925, 43 Stat. 954).

In '1925 Congress passed an act for the consolidation of the Indian lands within the Walapai reservation created in 1883. This consolidation was to be effected by an exchange of some of the Indian lands for private lands "* * * so that the lands retained for Indian purpose may be consolidated and held in a solid area so far as may be possible * * *". Act of February 20, 1925, ch. 273, 43 Stat. 954. In pursuance of this authority the Commissioner for Indian Affairs negotiated a contract with the Railroad Company under which the Indians were to have a consolidated area of 462,213.18 acres, and the Railroad Company 126,476.88 acres less, that is, 335,736.30 acres. The division was based on value rather than acreage. The estimated value of the lands retained, or transferred to the use of the Indians, was $245,221, and of the Railroad lands retained or procured by exchange was $212,517. At the time of this negotiation there was pending in the United States District Court for Arizona an action brought by the United States on behalf of the Walapai Indians, against the Santa Fe Railroad Company, appellee's predecessor, to determine the right to the waters flowing from Peach Springs which arose on an even-numbered section of land within the reservation and which it was claimed had been appropriated and used for over forty years by the Railroad Company, or its predecessors, on its odd-numbered sections. The proposed agreement for the exchange of lands settled the relative rights of the Indians and of the Railroad Company to the use of the waters of Peach Springs. In pursuance of this agreement a stipulation for a decree in the pending suit was entered into and a decree followed confirming the agreement as to the waters of Peach Springs.

Before the whole agreement was approved by the Secretary of the Interior a committee of the United States Senate held extensive hearings on the question of the rights of the Walapai Indians. The committee had before it the opinion of the Solicitor of the Interior Department, E. C. Finney, addressed to the Secretary of the Interior on September 16, 1931, and an opinion of Seth W. Richardson, Assistant Attorney General, acting for the Attorney General of the United States, dated November 12, 1931, both de-

nying the alleged possessory rights of the Walapai Indians to the odd-numbered sections of land within the Walapai Reservation of 1883. Notwithstanding these opinions the Chairman of the Committee requested the Secretary of the Interior to withhold approval of the agreement until the matter was further considered by the Committee. Walapai Papers, Document 273, 74th Congress, 2d Session, supra. If the rights of the Indians to the land in question were vested, beyond the power of governmental interference, the failure of the negotiated agreement for lack of approval by the Secretary of the Interior perhaps would deprive the Act of 1925, supra, and the negotiations under it, of all significance, except for the consummation of the agreement concerning the waters of Peach Springs. But the Indian right of occupancy is entirely dependent upon the will of the sovereign. Consequently, the negotiation of the agreement authorized by Congress was a recognition by the sovereign of the right of the Railroad Company to the possession of the odd-numbered sections, although the land was within an area set apart for the use and occupation of the Indians. The teaching of the cases is that the bare fee in the land, which is subject to the Indian right of occupancy, is practically valueless. Hence, no agreement of exchange was necessary unless the right of the Railroad Company to the odd-numbered sections included the right of possession thereto. It is unnecessary to hold that the Act of 1925, supra, and proceedings under it effectively negatived the Indian right of possession, if any, but it is at least cumulative evidence of a purpose of the government to deny a right of occupancy to Indians within the Mexican cession not recognized by Spain and Mexico.

It should be added that the negotiated agreement with reference to the lands within the reservation considered as an act of the sovereign, denying Indian possessory rights, is applicable as well to lands outside the reservation, described in the second count of the complaint.

 We conclude that evidence of which the courts take judicial notice which cannot be affected or overcome by testimony of possession, shows that the Walapai Tribe of Indians in Arizona have no recognized right of occupancy of public lands other than in reservations set apart by the government for the tribe;

that this right in the reservation set apart by Presidential proclamation in 1883 is subject to the prior vested right of the appellee to the odd-numbered sections of the grant within the reservation; that the decree should be affirmed as to land in controversy both within and without the reservation.

Affirmed.