JoNes, Chief Judge,
delivered tbe opinion of tbe court:
Pursuant to tbe terms of House Resolution 685, 82d Congress (the test of which appears below), tbe court herewith reports to the House of Representatives findings of fact[1] and conclusions thereon.
FINDINGS OF FACT
1. (a) On July 1, 1952, the House of Representatives adopted House Resolution 685 [82d Congress, 2d Sess.], the text of which follows:
Resolved. That the bill (PI. R. 8159) entitled “A bill for the relief of P. Diacon Zadeh,” now pending in the House of Representatives, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
(b) The text of H. R. 8159 follows:
* * * the Secretary of the Treasury * * * is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to P. Diacon Zadeh, such sum as will constitute just compensation for the requisitioning by the United States, on February 20, 1942, at Istanbul, Turkey, of the tanker Oilshipfer; the payment of such sum shall be in full settlement of all claims of the said P. Diacon Zadeh on account of such requisitioning.
2. At all times material to this action plaintiff was a citizen of Iran[2] and a resident of Istanbul, Turkey.[3] Prior to the *184 outbreak of World War II he owned an oil refinery in Eumania and a fleet of tankers and was engaged in the business of shipping and selling petroleum products.
3. The vessel herein referred to as the Oilshipper was built in Toulon, France, in 1920, as a coal-burning steam-propelled collier. It was subsequently converted into an oil-burning steam-propelled tanker. At all times material to this action the vessel was a tanker, with the following characteristics: hull, steel; length, 219.4'; breadth, 84.2'; depth, 12.3'; speed, 9 knots; tonnage, 1,138 gross, 564 net, 1,560 deadweight.
On February 20, 1942, the Oilshipper was in seaworthy condition and was owned by plaintiff.[4]
4. On June 3, 1938, the Oilshipper was registered in Panama, as the property of the Esturia Steamship Company, of London. On October 25, 1939, the Panamanian Consul in Braila, Rumania, again granted (provisionally) the flag of Panama to the Oilshipper as the property of August Demberg and gave him a provisional license of navigation, valid for six months. Thereafter, extensions for additional periods of six months were regularly made to Demberg, upon his application, carrying the license and flag to April 25,1942.[5]
5. Because of the scarcity of tankers in the Eastern Mediterranean in 1941, the Oilshipper, lying in Istanbul harbor, acquired strategic value to both the Axis and the Allied powers.
On November 24, 1941, the United States Secretary of State cabled the American Embassy in Panama:
*185 This Government is concerned over the possibility of the tankers Oilshipper and Le Progres being used by Axis interests. * * * discuss with the Panamanian Government the possibility of their being requisitioned.
German agents succeeded in buying the Le Progres, and continued their efforts to buy the Oilshipper.
On February 17, 1942, the American Consul in Istanbul cabled the Secretary of State:
* * * negotiations are apparently under way by a German * * * for the early purchase of the * * * Oilshipper * * *. * * * please instruct immediately if any steps should be taken.
On February 19,1942, the American Ambassador in Panama, acting under instructions from the Secretary of State, advised the Minister for Foreign Affairs of Panama by letter:
* * * concerning the requisition by * * * Panama of the * * * Oilshipper * * * the Government of the United States will save the Panamanian Government harmless from the effects of any claims arising from the requisitioning of this vessel. * * *
6. The Constitution of the Republic of Panama [6] contained the following provision:[7]
* * * In case of war * * * expropriation or occupation may be decreed by the Executive Power and the indem-nization need not be previous. When the return of the object occupied is feasible, the occupation shall be temporary and only for the time during which the circumstances justifying same shall persist. * * * The State shall always be responsible for all expropriation * * * or for the damages caused by the occupation, and shall pay the value thereof within a period not in excess of five years.
7. On February 19, 1942, Resolution No. 331-bis was adopted by the Govermnent of Panama, as follows:
The President of the Republic, Considering:
That Law 104 of 1941 empowers the Executive Department to take such measures which, in the present emergency, may be necessary for the purpose of national needs; [and]
*186 That in Turkish waters there is a national vessel — the “Oilshipper” — the incautación[8] of which becomes necessary for the mentioned purposes,
Resolves: To incautarse[9] the * * * vessel “Oilship-per” * * * and remit through the regular channels the necessary communications for the compliance of this decision. * * * [Italics supplied.]
8. Panama[10] did not maintain diplomatic or consular representatives in Turkey.[11] It authorized the diplomatic and consular representatives of the United States in Turkey to act for Panama. Accordingly, the Secretary of State, at the request of the Panamanian Government, instructed the American Consul at Istanbul “* * * to requisition the * * * Oilshipper on behalf of the Panamanian Government: * *
9. The requisition of the Oilshipper by the Republic of Panama was effected at Istanbul on February 20, 1942, by the American Consul acting as Charge d’Affaires for Panama. [ The notice of requisitionjwas handed to and accepted by the master of the vessel, Fadey Morstchikoff, who promptly relinquished control.
Plaintiff was advised of the requisition by letter from the Consul dated February 24, 1942.
10. The American Consul found it impossible to move the ship immediately. Cleaning and repairs were needed to improve the vessel’s speed, and clearances had to be obtained from the Government of Turkey. Morstchikoff was reengaged as master, and the necessary work went forward.
11. On March 13, 1942, plaintiff obtained from a Turkish court in Istanbul an order for the detention of the Oilshipper. After two extensions, the order was dissolved on April 29, 1942.
12. On April 28, 1942, Panama gave the United States an [option] extending for six months, to purchase the Oilshipper. *187 Meanwhile, American officials had engaged counsel to defend Panamanian interests in the Turkish litigation.
13. (a) Plaintiff’s first legal action was dismissed on April 29,1942.
(b) On the same day, August Demberg, as authorized and instructed by plaintiff, executed a bill of sale of the Oilshipper to Friedrich Hendle, a German.[12]
(c) On the same day, the German Consul General at Istanbul certified that title to the Oilshipper had been transferred by Demberg to Hendle, who had renamed the vessel Inela and indicated the home port as Bremen. The same Consul then certified that the vessel had acquired the right to fly the flag of the German Eeich.
14. (a) Upon release from the detention order of the Istanbul court, the Oilshipper, camouflaged, sailed into the Aegean Sea, where it was attacked by Italian planes. The vessel took refuge at Izmir.
(b) On May 26,1942, plaintiff applied to a court at Izmir for a detention order, alleging unauthorized movement of the vessel by the master.
(c) Some time later plaintiff applied to an Istanbul court for a detention order, on similar grounds. This court issued a “preventive attachment” on July 16, 1942.
15. (a) During June 1942, the United States and Panama agreed to undertake to sell the Oilshipper to Turkey. American officials in Turkey began negotiations accordingly, and found the Turkish authorities receptive. Agreement was reached in principle, but not in detail.[13]
(b) On August 3, 1942, Friedrich Hendle applied to an Istanbul court for a detention order against the Oilshipper, alleging that Demberg had refused to turn the vessel over *188 to him. The order was issued. It is not established by the evidence that the order was served.[14]
(c) On August 6, 1942, at Izmir, the harbor master, acting under instructions from the Turkish Government, took possession and control of the Oilshipper, removed the master and crew, replaced them with a Turkish master and crew,[15] and replaced the flag of Panama with the Turkish flag.
16. On orders from the Turkish Government the name of the Oilshipper was changed to Basari, and the vessel was given over to an agency of the Turkish Government for operation. It has so remained in operation since that time.
17. On August 20, 1942, the American Ambassador in Panama advised the Panamanian Government, by letter:
* * * the United States will, in connection with the sale of the vessel Oilshipper, to the Government of Turkey * * * save the Government of Panama harmless from any damage, injury, claim or expense which may arise therefrom. * * *
18. (a) On March 11, 1948, the American Ambassador at Ankara delivered to the Government of Turkey the following aide-memoire:
In order to finally dispose of the matter of the Oil-shipper, the American Government proposes that the Turkish Government transfer the sum of $300,000 to the credit of the American Government to cover the Turkish Government’s maximum liability in respect of the Oilshipper. The American Government will assume liability for any payments in connection with the Oilshipper in excess of this payment of $300,000. On receipt of the $300,000 the American Government will make payment of all expenses to the date on which the Oilshipper was taken over by the Turkish Government. It is estimated that the total of these expenses is not in excess of $43,000. After these expenses have been paid the American Government will effect a settlement with the former owner either by agreement or through *189 tbe medium of the courts. As soon as the settlement has been effected with the former owner, the American Government will repay to the Turkish Government any difference between the total of the expenses and the payment to the former owner, and the sum of $300,000. * * *
(b) On September 11, 1943, the Turkish Government replied:
Beferring to your letter of March 11, 1943, * * * my Government agrees to the proposal of the American Government in the terms of the aide-memoire annexed thereto for the definitive settlement of the Oilshipper affair.
* * * please find enclosed a check for three hundred thousand dollars drawn in favor of the Secretary of State at Washington as cover for the maximum obligation that can be incurred by the Turkish Government in accordance with this agreement for the transfer of ownership of the ship. * * *
(c) Payment of $300,000 was accordingly made by the Government of Turkey to the United States.[16]
19. On November 2, 1943, the American Embassy in Panama wrote the Panamanian Minister of Shipping:
With reference to your recent oral inquiry as to the present status of the former Panamanian tanker Oil-shipper., I take pleasure in sending along the following information just received from the Department of State.
After extended negotiations between the Governments of the United States and Turkey for a settlement of this question, it was agreed that the sum of $300,000 was to be transferred by the Government of Turkey to the credit of the Government of the United States to cover the Turkish Government’s agreed maximum liability. The Government of the United States has agreed to use these funds in the following manner:
(1) For the reimbursement of expenses accumulated prior to the date of the taking by Turkey of the Oil-shipper.
(2) To the final settlement with the former owner.
(3) Any surplus that remained to be repaid to the Turkish Government.
*190 1 am informed that my Government has recently received from the Turkish Government the funds in question and that these funds are now being held in trust to be used in accordance with the terms of the agreement above outlined. * * *
THE TAKING
20. (a) The Oilshipper was taken by the Eepublic of Panama on February 20,1942.[17]
(b) The vessel was taken by the Eepublic of Turkey on August 6,1942.[18]
(c) There has been no taking of the vessel by the United States.
(d) The United States intended, in initiating the taking by Panama, and in its agreements with the Governments of Panama and of Turkey, to hold each of them harmless (in accordance with their respective agreements) from the claims of the former owner of the Oilshipper (plaintiff) for compensation for the taking of his property.
(e) Plaintiff has made claim for compensation for the Oil-shipper to Panama and to Turkey. In both instances his claims were denied and he was referred to the United States. Neither Panama nor Turkey has made any formal commitment to plaintiff in the nature of subrogation.
(f) Plaintiff has applied to the United States for compensation for the Oilshipper. Nothing has been paid to him by the United States on account of such compensation.
21. The basic law of the Eepublic of Panama recognizes the institution of private property and forbids its confiscation for public use. Article 48 of the National Constitution of Panama, of 1941 (Article 49 in the revision of 1946), is the Panamanian counterpart of the provision in the Fifth Amendment to the Constitution of the United States that private property shall not be taken for public use without just compensation.[19]
*191 22. The law of Panama requires that there shall be paid to the owner of property taken for public use (a) the value of the thing taken, if it is expropriated (taken for title) or (b) “damages caused by the occupation,” if it is occupied (taken for use only).[20]
The Panamanian Constitution contains the further provision:
* * * When the return of the object occupied is feasible, the occupation shall be temporary and only for the time during which the circumstances justifying same shall persist. * * *
It is not established by the evidence when, by whom, or by what formalities, if any, the determinations are made (1) that “the return of the object occupied is feasible” or (2) as to the nature and duration of the “circumstances justifying” the occupation.
23. During the war years the Government of Panama requisitioned “national” vessels other than the Oilshipper for lease or sale to the United States. Nine resolutions relating to seven of these vessels are in evidence. They show (a) that the Government of Panama ordered (1) the “in-cautación” of the Panam, the Colombia, the Pereira, and the Farida; and (2) the “incautación y expropriacion” of the Sonora, the Omega, and the Oalobre; (b) that the Panam and the Farida were leased to the United States; (c) that the' Sonora, the Omega, and the Calobre were sold to the United States; (d) that after the Panam was “incautado” and leased to the United States, Panama decided to sell the vessel to the United States, whereupon a separate resolution referred to the vessel as “incautado” and ordered' “la ex-propriacion” of it; and (e) that the resolution by which the Farida was “incautado” was subsequently revoked.
24. (a) An expert in Panamanian law, testifying for plaintiff, expressed the opinion that the Spanish word “incauta-ción” was' synonymous with the Spanish word “occupa-cion”;[21] that the use of “incautación” in Resolution. No. *192 331-bis[22] and in other resolutions[23] of the Panamanian Government signified the present, limited, and continuing intention to order the “occupacion” of the vessels as distinct from their “expropriacion,” wherefore the Government of Panama was bound by its constitution to pay to the owners of the vessels “incautado” the “damages caused by the occupation,”
(b) Another expert in Panamanian law, testifying for defendant, expressed a contrary opinion. He considered it improper so to confine the meaning of “incautación.” He would not read into it either a limited or a continuing intention to order occupation as distinct from expropriation. On the contrary, he believed that “incautación” carried a connotation of “expropriacion,” and that, in any event it signified no more than the seizure of property by governmental process.
(c) Defendant’s expert in Panamanian law further testified that plaintiff was foreclosed, under the civil law equivalent of res judicata, from questioning in the courts of Panama the expropriation of the Oilshipper by reason of (1) the application by plaintiff’s Panamanian attorney for an official interpretation of Resolution No. 331-bis, (2) the official interpretation (declaring unequivocal expropriation) given in response thereto, and (3) plaintiff’s failure tojip-peal from the ruling. [ \
25. Under the law of Spain the term “incautación” was sometimes used to mean confiscation, with a connotation of penalty. This interpretation has been recognized by courts in the United States and in England.[24]
Upon the repudiation of confiscation as a governmental device by Panama and other South American countries, the word “incautación” continued in use, but with a meaning altered at least by the exclusion of either confiscation or connotation of penalty.
No precise English equivalent of the Spanish word “in-cautación” has been cited in the evidence. Most of the Eng *193 lish words used in connection with the acquisition of private property by public authorities have Spanish counterparts, often recognizable as being from the same roots: expropriation and expropriation; occupation and occupation; requisition and requisition; embargo and embargar; seize and oc-cupar; take and tomar; sequestration and sequestration.
Linguists and civil law experts are agreed that incautación means the taking of possession by public authority. Agreement between them ends at that point.
It is not established by the evidence that the word “in-cautación” as used in Panamanian Resolution No. 331-bis (1) signified a present and continuing (or even a present) intention to subject the Oilshipper to occupation only, in the limited and distinctive sense of “occupacion” as used in Article 48 of the Panamanian Constitution or (2) excluded the expropriation of the vessel as being inherent in the “incautación.”
26. The “incautación” of the Oilshipper under the authority of Panamanian Resolution No. 331-bis may have been intended to leave the nature of the taking undefined temporarily, as is sometimes the case in the requisition of property under the common law system.
If so: (1) the issue was resolved in favor of expropriation by (a) the determinations by Panama to sell the vessel (i) to the United States and (ii) to Turkey, and (b) the approval by Panama of the taking of the vessel by Turkey; and (2) there is no evidence of any requirement in Panamanian law that the owner of the property taken be notified of the determination of the nature of the taking other than by the action of the Government in relation to the property taken.
27. The taking of the Oilshipper by Panama constituted a taking of the title of the vessel on (or as of) February 20, 1942.[25]
*194 VALUE[26]
28. Under Panamanian law tbe determination of the value of property expropriated for public use is a judicial function. The court determines and orders paid the value of the thing at the time and place of taking. In making its determination the court is guided by the opinions of experts. After expert opinion has been presented on behalf of the owner and the Government, the court may call in a third expert of its own choosing and seek advice from him.
29. Under the civil law doctrine of “plus valia,” recognized in Panama, benefits accruing to property (usually real estate) as the result of expropriation by the Government (such as the construction of improvements or the announcement of improvements to be built by the Government) are taken into consideration in determinations of value in terms of either deductions or additional assessments.[27]
It is not established by the evidence that the doctrine of “plus valia” would apply to the determination of the value of the Oilshipper if such valuation were to be made by a Panamanian court.
30. The Panamanian law excludes from the consideration of value such elements as the strategic value of the Oilshipper to the belligerent powers.[28]
31. (a) The Constitution of Panama directs that payment of the value of property expropriated shall be made “within a period not in excess of five years.”
(b) There is no evidence of recognition by Panamanian law of compensation for delay in the payment of value.[29]
*195 32. Applying the concepts of Panamanian law as established by the evidence in this case, and considering the opinions of experts as presented in the evidence, the fair and reasonable value of the Oilshipper in Istanbul, Turkey, on February 20, 1942, is found to be $170,000.
ON TREATING WITH THE ENEMY [30]
33. Before World War II plaintiff’s -net worth was near five million pounds, sterling. At the time of trial he did not know whether he was wealthy or not. The real assets formerly represented by his oil refinery and ships had evaporated into claims of one kind or another.
The Eumanian oil refinery fell into the hands of the Germans early in the war. During part, if not all, of the German occupation of Eumania, plaintiff received compensation from Germany for the refinery. When Soviet Eussia occupied Eumania in 1945, the compensation ceased, and plaintiff has had no return from it since.
Following a disagreement between plaintiff and some of his financial associates in 1936, revisions were made in the ownership of the vessels which plaintiff had theretofore controlled. He retained the ownership (and control) of five vessels, the Beme, the Esturia, the Napthashipper, the Eregli, and the Oilshipper[31] He retained a minority interest only in two tankers, the Lukia and the Le Progres.
The Lukia was sunk in 1937, off the coast of Spain. No settlement has been received by plaintiff from his coowners of the vessel.
The Napthashipper, flying the British flag, was interned at Hamburg by the Germans upon the outbreak of war. Plaintiff has a claim for it pending, which he filed through the British Government.
The Esturia was sunk by a German submarine in 1939, off Antwerp. Plaintiff has a claim for the vessel against his former associate in England.
*196 The Beme was sunk by an Italian submarine in 1940, off Haifa. Plaintiff has a claim pending against Italy for the vessel.
The Le Progres was sold by plaintiff’s associates, without his knowledge or consent, to German nationals representing themselves as being a Swiss company. No settlement for his interest in the vessel has been received by plaintiff from his coowners. The Le Progres was sunk by a Russian submarine in the Black Sea in 1941.
The Oilshipper was taken by Panama on February 20, 1942.
The fate of the Eregli is not established by the evidence.
34. Plaintiff’s business methods, as far as revealed by the evidence, were in keeping with the objectives of a shrewd, determined business man intent upon the largest gain in the shortest time from operations extending into many countries and therefore crossing many international boundaries.
The nature and purpose of his operations led quite naturally to the use of alter egos, in corporate form as well as through employees.
Plaintiff was not averse to taking risks, and he was largely indifferent to the sources of the revenues payable for his commodities or services. Pie sold oil or oil freight to both sides of the Spanish civil war. He was averse to the payment of insurance premiums, marine or war risk, and contented himself with the obligations of charterers to protect his interests against such hazards. He hedged currencies and rates of exchange one against another and, after the war began in 1939, he hedged all against gold. He manipulated ownerships and charters in terms of national requirements of taxes and assessments. He was alert for the highest possible exactions of freight rates, charter hire, and sales prices.
During the closing months of 1941 and the early part of 1942, plaintiff was living in Istanbul, Turkey. The Oil-shipper was there with him. The remainder of his fleet, with the possible exception of the Eregli, had been destroyed or removed from his control. Iran, whence came his passport, based on his citizenship; was occupied by the British and the Soviet. His son was in London. The Germans had *197 his oil refinery and one of his tankers, the Napthashipper. His Istanbul manager was a Norwegian. One of his trusted ship captains, Morstchikofi, was a Russian; the other, Dem-berg, was of German origin. The pressures to which h8 was, or could be, subjected were diverse.
35. The German effort to buy the Oilshipper from plaintiff was headed by a German national named Albrecht. He represented himself as the agent of a Swiss firm which had been allied with Dutch interests. The negotiations between Al-brecht and plaintiff were in terms of Swiss exchange based on credits established through Swiss banks. Plaintiff nevertheless knew that Albrecht represented German interests. Plaintiff would have sold the Oilshipper to Albrecht if the latter had been willing and able to meet plaintiff’s terms (for gold, instead of paper money).
While plaintiff’s negotiations with Albrecht were pending, plaintiff authorized his Istanbul office manager to apprise the British of the negotiations, and to ascertain whether the British were willing to offer equal or better terms. The British made what they considered a liberal offer under the circumstances, but it was not equal to the Albrecht potential. Thereafter, plaintiff was advised by an Iranian official in Turkey (whose Government had been prompted by British and American representations) that his Iranian citizenship might be cancelled if he persisted in selling the Oilshipper to the Germans; and plaintiff’s son was arrested in London.^ Plaintiff thereupon abandoned the effort to sell to Albrecht. By that time, however, Albrecht himself had abandoned the negotiations, because of plaintiff’s adamant refusal to sell without the payment of gold.
36. Plaintiff’s efforts to defeat the requisition of the Oil-shipper by Panama in the Turkish courts were of the same pattern as his business dealings. He used Demberg, one of his alter egos, for whatever would serve the purpose of the moment, and he directed his counsel to take whatever steps were best calculated to prevent the departure of the Oil-shipper from Turkish waters. The factual bases of some of the steps taken in plaintiff’s Turkish litigation were such that, in an American court under similar circumstances, a *198 suggestion of review from the standpoint of disciplinary action against client or counsel would have become a possibility.
Plaintiff directed the execution of the bill of sale by Dem-berg to Hendle. There is no evidence that any consideration for the purported transfer passed from Hendle to Demberg or to plaintiff. The inference is the other way around: that Hendle himself was a straw man for plaintiff, and that it was at plaintiff’s instance that Hendle obtained from the German Consul the certificate of ownership, flag, name, and home port; and the dispatch to Izmir of a German captain and crew.
37. It is not established by the evidence that any of plaintiff’s actions in his dealings with nationals of countries with which the United States and Panama were at war (a) resulted in benefit to any such enemy country or (b) were taken with intent to provide such benefit or to harm the United States or Panama.
CONCLUSION
In the light of the entire record plaintiff appears to be a man who had few attachments to any country. He was willing to trade with either, both or all sides, and was willing to play one against the other in order to exact the highest price obtainable. Nevertheless, the plaintiff was the owner of the vessel. Its strategic value lay largely in the fact that neither of the warring parties wanted it to fall into the hands of the other side. Any strategic enhanced value was largely offset by the fact that the vessel was located in critical waters and was in danger of being lost or sunk. In fact, some of the other vessels owned by plaintiff were sunk and others lost. In all the circumstances it is apparent that any payment should be limited to the normal or actual value.
There is no legal liability due to the fact that the petition was filed in this court more than six years after the taking. But the vessel was taken at the instance and for the benefit of the United States which has agreed to hold the government of Panama harmless. Panama has in effect passed to the United States the determination of what her obligation may be.
*199 We recommend therefore that plaintiff be paid the sum of $170,000.
Apparently no provision is made in Panamanian law for the payment of interest as a part of just compensation. In the United States, under a rule established by the Supreme Court, interest is customarily allowed, usually at the rate of 4 percent per annum. United States v. Shoshone Tribe, 304 U. S. 111.
Whether on the basis of the facts which we have found, interest for the delay in payment should be allowed as a part of just compensation, is left to the judgment of the Congress.
Laeamoke, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.

 The findings are made by tbe court, upon tbe evidence, the report of Commissioner W. Ney Evans, and the briefs and arguments of counsel.

 It is not established by the evidence that the Government of Iran accords to citizens of the United States the right to prosecute claims against the Government of Iran in Iranian courts.

 Plaintiff was born in Persia in 1886 of White Russian parents living in Azerbaijan province. At the trial of this action he spoke in the Russian language, testifying through an interpreter.

 Plaintiff’s chain of title began on June 5, 1937, when the Oilsshipper (then Gilda Ambatielo) was sold by Constants (South Wales), Limited, a British corporation, to another British corporation, the Esturia Steamship Company, Limited, which plaintiff owned. Whatever cash was passed in this transaction was provided by plaintiff, rather than the corporation. Plaintiff held a broad power of attorney from the corporation, and used the company as an alter ego. He did the same with two ship captains in his employ, August Demberg and Padey Morstchikoff. The Oilshipper was transferred from Esturia Steamship Company to Morstchikoff on May 11, 1939; from Morstchikoff to Demberg on October 11, 19391; and from Demberg to plaintiff on October 18, 1940. All transfers were at plaintiff’s direction. He was the beneficial owner of the vessel at all times, and held the title as well as the beneficial ownership on February 20, 1942.

 Title to the vessel passed from Demberg to plaintiff on October 18, 1940. Demberg duly notified the Panamanian Consul, who later notified the proper officials of Panama. The Republic of Panama considered the Oilshipper a national vessel of Panama on February 20,1942.

 Approved January 2, 1941.

 Article 48.

 The Spanish word is retained in the text at this point, since its proper translation is an issue in this case. See findings 23 to 27.

 Ibid.

 Panama became one of the Allied belligerents against the Axis on December 12, 1941.

 Turkey was not a belligerent during World War IX.

 Plaintiff testified that this was a strategic action. On March 4, 1942, Demberg, also at the instance of plaintiff, had cabled Panama that he had sold the Oilshipper to plaintiff, and ashed that his name be removed from the shipping register.

 Also in principle, bnt not in detail, it is clear from the evidence (1) that the Turkish Government was interested in and somewhat troubled by the political implications of (a) the seizure, in Turkish waters, by a belligerent, of a ship flying the belligerent's flag and (b) the consequences of judicial action in and review of the situation, and (2) that meanwhile the situation was a matter of diplomatic concern between the united States and Turkey.

 The preventive attachment obtained by plaintiff from an Istanbul court on July 16, 1942, was still in effect. (It was lifted In September 1942.) American officials became convinced that plaintiff was undertaking to keep the ship inactive indefinitely by court action. Plaintiff was, in fact, still seeking reviews by the Turkish courts late in 1943.

 In connection with the court order issued upon Hendle’s application, the German Consul had dispatched a master and crew to take over the vessel Turkish authorities were aware of this action.

 From this fond the united States paid expenses incurred in the taking of the yessel in the amount of $43,3il0.19. The balance of $256,689.8.1 remains on deposit with the United States for the purposes stated in the agreement with Turkey.

 At the time of this taking the vessel was owned by plaintiff.

 Plaintiff had challenged the validity of the taking by Panama in the courts of Turkey. The Government of Turkey did not know, on August 6, 1942, whether the vessel rightfully belonged, under Turkish law, to the Republic of Panama, plaintiff, or the German Hendle. This uncertainty was the major consideration in the action by the Turkish Government.

 There is insufficient evidence of the comparable law of Turkey to warrant a finding on the subject.

 "Value” for “expropriacion” and “damages” for “occupacion” are separate and distinct concepts in the civil law.

 The same would be true, of course, of other forms of the word: the verb “incauto”; the past tense “incautado”; and the infinitive “incautarse.”

 Finding 7.

 Finding 24.

 The Namevar, 24 Fed. Supp. 501; Societe Belge, 60 Lloyd’s List of Law Reports, 232.

 under any construction of the evidence, plaintiff’s title to the vessel was gone on and after August 6, 1942, when Turkey took the ship. Plaintiff does not seriously dispute this fact. He has rested his case on the contention that the “incautación” of the vessel was tantamount to a compact with him on the part of Panama to pay him damages for the occupation, and that this compact, dating from February 20,1942, has never been altered.

 The findings under this heading are limited to the determination of value payable for property expropriated.

 Panamanian law has developed no nearer equivalent of the American requirement for deducting enhancement resulting from the causes necessitating the taking.

 Just before the Oilshipper was taken by Panama plaintiff was negotiating with Germans (who purportedly represented Swiss interests) for the sale of the vessel for $2,200,000. (Plaintiff was demanding gold, which the Germans were unwilling or unable to pay. Finding 35.) Likewise, the British had offered double their standard requisition charter rate for a charter of the vessel. Except for these indications of strategic value, there is no evidence of enhancement in the value of the Oilshipper resulting from the causes necessitating the taking.

 No mention is made of any Panamanian counterpart of the American rule allowing interest, not as interest but as part of just compensation.

 Defendant lias requested findings to tlie effect (1) that plaintiff gave aid and comfort to the enemies of the united States and of Panama; (2) that plaintiff caused the Oilshipper to be sold to a German and to be given a German flag, name, and home port; and (3) that the united States is entitled to regard plaintiff’s claim as being subject to the various peace settlements with the Federal Republic of Germany.

 The Eregli was a dry cargo ship. All the others were tankers.